[Crim. No. 4863. Fourth Dist., Div. Two. May 12, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
GERALD GEORGE LAWRENCE, JR., Defendant and Appellant.

## COUNSEL

Arthur E. Lester for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Howard J. Schwab and William R. Pounders, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KERRIGAN, J.**—Convicted by a jury of conspiracy to murder Warren Hudson (Pen. Code, § 182, subd. 1), the defendant, Gerald George Lawrence, Jr., waived a jury trial on the penalty issue and was sentenced to life imprisonment.[1]

In 1968 Lawrence Allen Fassler headed a massive narcotics smuggling ring, with its base in Culiacan, Mexico. Marijuana was packaged in Mexico by a crew of 40-80 Nationals. The packaged contraband was ordinarily flown to Tucson, Arizona, and thereafter transported by truck to San Francisco, California, for sale. Fassler directed U. S. operations. The defendant, Gerald George Lawrence, Jr., was in charge of the Mexican packaging operation. Warren Hudson was the pilot for the organization, being responsible for flying the contraband from Mexico to Tucson from where it was generally trucked to San Francisco.

Testimony of 70 persons was introduced in the course of defendant's trial, with Edward Frank Rose, a member of the narcotics ring, being the chief prosecution witness.

In June 1968, Hudson flew the organization's Cherokee Six plane to Tucson with a load of 813 kilos of marijuana. The shipment was placed in

---

[1]Defendant Lawrence was originally charged with conspiracy to murder Hudson and also with Hudson's murder. Also named in the two-count indictment were the codefendants, Lawrence Allen Fassler, Edward Leroy Chandler, and Kenneth Frederick Oldright. Defendant's trial was severed from that of the codefendants. The jury found him not guilty of the murder charge.

a large U-Haul truck by Rose and another Fassler employee named Sloan and transported to the San Jose area. Fassler had instructed the two men that upon their arrival in San Jose they were to contact him and take instructions about delivery to another organization agent (Hottinger) at a designated time and place, and the latter would direct them to the site where the 813 kilos were to be delivered and sold. Instead, by pre-arrangement, Rose and Sloan met Hudson in San Jose on June 14-15. Hudson had devised a plan to "rip-off" Fassler, i.e., to steal the money derived from the sale of this load of marijuana. He had enlisted Rose and Sloan in the plan. Upon Hudson's orders, Rose and Sloan delivered 500-513 kilos to the City of Felton in the Santa Cruz Mountains, where they sold it for $27,000 cash. Rose and Sloan returned to San Jose and conferred further with Hudson. In accordance with Fassler's instructions, Rose and Sloan next met with Hottinger on a main street in San Jose. Hottinger was accompanied by three henchmen. While Rose and Sloan were engaged with Hottinger and his confederates, Hudson was hiding in the rear of the U-Haul truck, armed with two .45 automatics. Upon instructions from Hottinger, Sloan was told to drive the truck and follow Hottinger and his friends to a shack in an uninhabited area of the Santa Cruz Mountains. Rose rode in Hottinger's Valiant. One of Hottinger's friends drove a Ford Torino rented by Hudson, Rose and Sloan, with Sloan following in the truck. When the three vehicles arrived at the cabin, Hottinger, his friends, and Rose went in, leaving a strong-armed guard outside. Employing a ruse, Sloan lured the guard to the rear of the truck where Hudson ordered the guard to "freeze," disarmed him, and padlocked him inside.

In the interim, other buyers arrived. Acting on the assumption the truck contained over 800 kilos, Hottinger indicated he had $64,000 in cash for the shipment. Another buyer gave Rose $3,000. (Rose pocketed the $3,000 and did not tell Hudson about it later.)

Utilizing a pretext, Rose managed to go outside, joining Hudson and Sloan. Hudson ordered him to go around to the back door and re-enter with his gun. However, Rose never made it to the back door, falling down a hill en route. Hudson entered the front door, held everyone up, and left with the briefcase containing the $64,000. Sloan let the air out of all the tires of all vehicles before they fled, with the exception of the Ford Torino used in effecting their escape.

Hudson, Sloan and Rose went to the Monterey area and divided the $90,000-$95,000. Rose received $16,000 of the loot, plus the $3,000 he had surreptitiously kept. The three men then went to Fresno, caught a

plane, and then split up, with Rose purchasing a 1965 Cadillac and taking his family to Massachusetts, where he hid out in the Boston area.

Hudson invested $50,000 in a 65-foot air-sea rescue boat named the "Blue Fin" which he docked in Wilmington. In turn, Fassler learned that Hudson had purchased a boat and had men in his organization attempting to locate it and Hudson.

Fassler not only lost the 800 kilos. Presumably, he also assumed the cash loss incurred in the "rip-off" by indemnifying Hottinger and the other buyers in the sum of $67,000.

In late August or early September, Rose left his family in Massachusetts and flew to Oakland. Upon receiving assurances that Fassler was willing to forgive and forget, he met Fassler in Culiacan, Mexico, on September 11. He told Fassler he received only $3,000 from the "rip-off," and Fassler indicated he did not hold him personally responsible as he knew Hudson was the primary instigator. Once again, Rose became a member of the Fassler organization.

On September 24, 1968, Rose heard from Hudson. Hudson wanted Rose to join him in a new business venture. The following evening Rose was contacted by Fassler. He wanted to know where Hudson was. Rose did not know his exact whereabouts, and Fassler asked Rose to let him know as soon as he located him. In the same conversation, Fassler asked Rose if Kenneth Oldright ". . . would be interested in getting rid of and recovering the money from Warren Hudson." Rose said he didn't know, but he would find out.

On September 29, Rose and Oldright flew to Tucson to meet Hudson. En route Rose told Oldright about Fassler's proposal. Oldright indicated he might be interested in the proposition, depending on the outcome of the forthcoming meeting with Hudson.

When they met with the pilot in Tucson, Hudson indicated he was going to purchase a used B-26 bomber and start a new operation. They visited the International Airport, looked at the bomber, and had lunch. During lunch, Hudson informed Rose and Oldright that he kept the Blue Fin at Wilmington. He invited them to accompany him to the boat. Oldright declined, but Rose flew to California with Hudson, and remained overnight on the boat. The next morning, Hudson accused Rose of withholding $3,000 from the "rip-off." When Rose tried to leave, he was strong-armed by Hudson's subordinates and pistol-whipped by the cook. Hudson then gave orders to start the engine and said they were going to dump Rose

in the ocean, but Rose talked his way out of it by promising to join Hudson's organization.

On October 2, 1968, Fassler called Rose and Rose told him that Oldright was interested in seeing him and also told Fassler what had happened on Hudson's boat. Fassler set up a meeting that night with Rose and Oldright at the Berkeley Plaza Hotel. Shortly after the meeting site was agreed upon, Rose also received a phone call from the defendant herein expressly requesting that he (Rose) be present because he did not know Oldright and wanted to be personally introduced to him.

Rose and Oldright went to Berkeley together and went to the room Fassler had reserved for the meeting. Shortly thereafter Fassler and the defendant arrived.

In the ensuing conversation involving the four men, Fassler discussed the recovery of the money and the possible elimination of Warren Hudson. Fassler offered Oldright $1,500 to do the job. Oldright refused the offer. Fassler asked the defendant, "What do you think?" and defendant replied, "Well, the guy has got to be hit. It's either you or him." Fassler said, "I guess you're right." Fassler then offered Oldright $5,000 and Oldright agreed. Fassler asked Oldright how he would do it, and Oldright replied, "Never mind how I will do it. I'll do it right. I have somebody that's going to assist me with it. I'll get rid of him and there won't be no trace of him when it's done."

Within two days after the meeting, both Fassler and the defendant phoned Rose and asked him the precise location of the Blue Fin in Wilmington.

On October 6, 1968, Rose and Oldright met with Fassler in Tucson where Oldright purchased $330-$340 worth of guns and tear gas with funds supplied by Fassler. Oldright told Fassler that he had everything he needed. Oldright placed the weapons in a guitar case and flew to California.

On October 8, Oldright rented a secluded residence in Perris near Riverside, where he was observed digging with a pick and shovel on October 12.

On Sunday, October 13, 1968, Hudson and his mistress checked in at the Ramada Inn in Riverside for the purpose of meeting with Oldright to set up a "deal." Oldright and a crony named Edward Chandler arrived at the motel in a 1957 black Cadillac and met Hudson in his room. They lured Hudson away from the motel on the pretext that they wanted to show him the Perris house Oldright had rented for storing narcotics in connection with the new operation. They left the girl at the motel about

8:30 p.m. When they left, Hudson was wearing an expensive Jaquet Groz diving watch and a distinctive gold medallion about the size of a quarter.

About 5 a.m. the next morning, Oldright called the girl and told her she should leave Riverside immediately because ". . . something bad had happened to Warren [Hudson]." With the exception of Oldright and Chandler, the girl was the last person to see Warren Hudson alive.

Defendant concedes on appeal that Hudson died at the hands of Oldright and Chandler. However, Hudson's body was never recovered, having been completely destroyed with sulphuric acid. Total extinction of the body finds support in the following evidence: The owner of the Perris residence rented to Oldright noted an excavated area on the property and dug up the loose dirt. In the hole were containers of liquid, gas masks, a grenade, plastic gloves, a length of coiled rope, and some rolls of very heavy plastic. A cursory examination of the liquid containers indicated each contained some type of acid. A scientific analysis established that the bottles contained sulphuric acid of 94.5 percent concentration. A clinical chemist testified that the sulphuric acid was capable of decomposing and deteriorating every part of the human body.

The $5,000 consideration for the killing was taken from Hudson's body and retained by Oldright. In November 1968 (prior to any investigation into Hudson's killing) Oldright was arrested at the Palm Springs airport for smuggling marijuana. At the time of his arrest, he was wearing Hudson's medallion around his neck. When booked, he was wearing the Jaquet watch. When he was released from custody, the jewelry was returned to him.

Following his disappearance, Hudson's wife and father tried unsuccessfully to locate him through relatives, friends, associates and law enforcement agencies. Later, Fassler told Hudson's widow that he was dead. Fassler offered to pay the widow $15,000 for the boat, but she refused. The widow eventually sold the boat for $20,000.

On October 14, Oldright phoned Rose and informed him to get out of town, that Hudson's people would be looking for him, and that Hudson ". . . doesn't exist any longer. . . ."

Shortly following Hudson's disappearance from the Ramada Inn, the defendant took Oldright's Cadillac to a Riverside garage for repairs.

On October 21, defendant told Rose that he had heard that Fassler had been arrested by federal police in Mexico and he was catching the next plane for Nogales to negotiate Fassler's release. Instead, on October 22, 1968, defendant telephoned a friend and said he needed some help; he

said he had "just ripped off [Fassler] for $26,000." His friend suggested he negotiate an accommodation with the Federal Bureau of Investigation wherein he would help them to get Fassler and stop Fassler's smuggling in exchange for immunity.

In 1969, the federal authorities interviewed the defendant regarding Fassler's smuggling operations. In one conversation, he made the following statement to a criminal investigator regarding Warren Hudson. "He's dead. Don't ask me how I know but I can assure you he is dead."

In February 1970, a reporter for the San Diego Evening Tribune interviewed the defendant. He told defendant he was investigating Hudson's disappearance and alleged murder. Defendant told the reporter that he had been granted immunity in Fassler's federal smuggling trial, and that he had not committed any crime in the 13 months prior to the discussion; the reporter informed the defendant that he had been told that the defendant was in a California hotel room when Fassler offered Oldright $5,000 to kill Hudson; defendant said he was in the hotel room, but he could not remember how much Fassler agreed to pay for the murder; defendant claimed he was part of the initial discussion but not part of the final agreement.

Defendant testified in his own behalf to the following effect: He was in the Berkeley hotel room with Fassler and Oldright; however, he left the room before any contract to kill Hudson was discussed; while he attempted to locate the Blue Fin for Fassler, he had nothing to do with Hudson's death; he denied ever taking Oldright's Cadillac to a Riverside garage following Hudson's disappearance; on October 20, he collected some of the organization's money in San Francisco; he gave $10,000 of the money to his Phoenix attorney for safekeeping and then went to Las Vegas; he spent $4,000 to purchase some new luggage, clothing and a pickup; in all, he "ripped-off" Fassler for $21,000.

The factors comprising the background of the killing have little connection with the issues raised on appeal. These issues may be defined as follows: (1) Defendant was granted immunity in federal court in Fassler's smuggling trial, and this immunity extends to prosecution for the conspiracy to murder charge; and (2) prejudicial hearsay statements of a coconspirator were erroneously admitted in violation of the United States Constitution confrontation clause.

In resolving the immunity issue, it becomes necessary to consider the history of the prior litigation wherein the defendant was granted immunity. After defendant took Fassler's $21,000 in October 1968 and consulted with a friend, he eventually acted on the friend's advice to expose Fassler's

smuggling operation in exchange for immunity. In any event, sometime in November 1968, he got in contact with Customs officials. In September 1969 defendant was called as a prosecution witness in the United States District Court in the case of the United States of America v. Larry Fassler (C-20309-Tucson), wherein Fassler was accused of violating federal statutes prohibiting the smuggling of narcotics during the period January through March 1968. After taking the stand and admitting that he knew Fassler, the defendant invoked the Fifth Amendment privilege against self-incrimination. The deputy attorney general then offered in evidence a letter signed by Will Wilson, assistant attorney general, authorizing the United States attorney in charge of the prosecution to seek a grant of immunity pursuant to the provisions of 18 United States Code section 2514 in the event the defendant asserted his privilege against self-incrimination. The federal trial judge considered the contents of the letter and informed the defendant that ". . . you will be immune from prosecution for anything your testimony may disclose . . . ." Defendant then testified as to the role he played in Fassler's smuggling operation for the period January through March 1968, indicating he worked briefly for Fassler in January for $1,000 monthly, left his employ and returned to Fassler's organization in March 1968 at a salary of $2,000 per month. He also testified that after being re-employed by Fassler, he packaged a load of marijuana for shipment pursuant to Fassler's instructions, and that on March 22, while in Culiacan, Mexico, he received a telephone call from Fassler that the authorities had intercepted the shipment at the Marana Airport in Marana, Mexico, and that two of Fassler's employees "had been busted."

On direct examination, defendant testified that Fassler frequently used the name or alias "John Prescott" during 1968. On cross-examination, defendant admitted that he also used the name "John Prescott" on several occasions during the period January 1968 through the fall of 1968.

During defendant's trial herein, he again admitted using the name "John Prescott" in 1968. Rose also testified that defendant used the alias when the defendant and Fassler met with him and Oldright at the Berkeley Plaza Hotel, where Fassler made the contract with Oldright to kill Hudson.[2]

██ It is settled that immunity granted to a federal witness must protect him against state incrimination as well as federal. (*Murphy* v. *Waterfront Comm'n.,* 378 U.S. 52 [12 L.Ed.2d 678, 84 S.Ct. 1594].) Defendant

---

[2]Some of the factual background relating to the immunity issue has been obtained from a petition for writ of habeas corpus which was filed in this court on August 25, 1970 In re Gerald George Lawrence, Jr. on Habeas Corpus. The petition was filed prior to the defendent's trial and sought his release from custody on the basis of the federal immunity grant. The petition was summarily denied.

contends his federal immunity precluded the state prosecution in that the conspiracy to murder arose out of the Fassler smuggling operation, concerning which he was compelled to testify, and that said immunity prohibited the use in this trial of the alias "John Prescott," in that he admitted utilizing that alias in the prior proceeding.

Section 2514 of title 18 United States Code provides as follows: "Whenever in the judgment of a United States attorney the testimony of any witness, or the production of books, papers, or other evidence by any witness, in any case or proceeding before any grand jury or court of the United States involving any violation of this chapter or any of the offenses enumerated in section 2516 [any offense punishable by death or by imprisonment for more than one year under sections 2274 through 2277 of title 42], or any conspiracy to violate this chapter or any of the offenses enumerated in section 2516 is necessary to the public interest, such United States attorney, upon the approval of the Attorney General, shall make application to the court that the witness shall be instructed to testify or produce evidence subject to the provisions of this section, and upon order of the court such witness shall not be excused from testifying or from producing books, papers, or other evidence on the ground that the testimony or evidence required by him may tend to incriminate him or subject him to a penalty or forfeiture. *No such witness shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he is compelled, after having claimed his privilege against self-incrimination, to testify or produce evidence, nor shall testimony so compelled be used as evidence in any criminal proceeding (except in a proceeding described in the next sentence) against him in any court.* No witness shall be exempt under this section from prosecution for perjury or contempt committed while giving testimony or producing evidence under compulsion, as provided in this section." (Italics added.)

Since a grant of immunity is, in effect, a replacement for the constitutional privilege of self-incrimination, the immunity must be as broad in scope as the privilege it replaces. (*Counselman* v. *Hitchcock,* 142 U.S. 547, 585 [35 L.Ed. 1110, 1121, 12 S.Ct. 195].) It is axiomatic that if a witness has been granted immunity, evidence as to the substance of his testimony cannot be used against him at a later trial, either by introducing a transcript of his testimony or by questioning him with reference to his testimony. (*Counselman* v. *Hitchcock, supra,* pp. 585-586 [35 L.Ed. at pp. 1121-1122].) Nor can the compelled testimony be used to search out evidence which can be used against the witness in a later criminal proceeding. (*Counselman* v. *Hitchcock, supra; Murphy* v. *Waterfront Comm'n., supra,* 378 U.S. 52, 77-79 [12 L.Ed.2d 678, 694-695, 84

S.Ct. 1594].) Known as *use-plus-fruits immunity,* this rule permits the state to secure information necessary for effective law enforcement, while leaving the witness and the federal government in "substantially the same position as if the witness had claimed his privilege in the absence of a state grant of immunity." (*Murphy* v. *Waterfront Comm'n., supra,* p. 79 [12 L.Ed.2d at p. 695].) There is authority for the proposition that the Constitution also requires the granting of *transactional immunity,* that is, that a grant of immunity "must afford absolute immunity against future prosecution for the offense to which the question relates." (*Counselman* v. *Hitchcock, supra,* 142 U.S. 547, 586 [35 L.Ed. 1110, 1122, 12 S.Ct. 195].)

■ By the terms of section 2514 of title 18 United States Code, defendant was granted both transactional and use-plus-fruits immunity. Defendant first contends that his *transactional immunity* is so broad as to preclude trying him for conspiring to murder Hudson. However, defendant's testimony in Fassler's federal trial was limited to his association with the organization between January and March 1968, and concerned only the smuggling activities of the organization. The conspiracy to murder Hudson was not known to the authorities at that time. No reference was ever made to Hudson's disappearance in the federal action. Defendant requested immunity only as to the killing of one "Joe Cole," and his participation in hauling two shipments of marijuana to San Francisco. The conspiracy to kill Hudson was clearly a separate transaction. It had to do with Hudson's double-cross of Fassler in June 1968. The meeting in Berkeley where plans for Hudson's death were formulated did not take place until the following October. At that meeting, four persons (defendant, Rose, Oldright and Fassler) entered into a specific and separate agreement to kill Hudson. The conspiracy was not a part of, or even the result of, smuggling operations between January and March 1968.

■ Defendant also contends that his *use immunity* is so broad as to prevent the prosecution from introducing into evidence against him any *fact* concerning which he testified in federal court. Specifically, he urges that since he was compelled to testify that he used the alias "John Prescott," the state could not ask any witness at his subsequent trial whether defendant used that alias. Because use immunity is as broad as the privilege against self-incrimination, it has been held to cover testimony which is *substantially connected with* the crime for which the witness is being prosecuted, or which constitutes *links in the chain of evidence* against him. (*Smith* v. *United States,* 337 U.S. 137, 148-149 [93 L.Ed. 1264, 1272-1273, 69 S.Ct. 1000, 1008]; *Edwards* v. *United States,* 312 U.S. 473, 479-480 [85 L.Ed. 957, 962-963, 61 S.Ct. 669].)

In *Heike* v. *United States,* 227 U.S. 131 [57 L.Ed. 450, 33 S.Ct. 226], defendant contended that as soon as he had testified upon a matter under the Sherman Act, he had immunity from any and every offense that was connected with that matter in any degree. The court stated that at times it seemed the defendant was arguing that any testimony, although not incriminating, if relevant to the later charge, brought immunity into play. In rejecting the contention, the court stated, "When the statute speaks of testimony concerning a matter it means concerning it *in a substantial way,* just as the constitutional protection is confined to real danger, and does not extend to remote possibilities out of the ordinary course of law." (Italics added.) (*Ibid.,* p. 144 [57 L.Ed. at p. 455].)

Although it was necessary to establish that defendant used a particular alias during the conspiracy to murder Hudson, this was merely a matter of identification. It is no more a link in the chain of evidence than if defendant had been asked what his name was. His use of an alias did not concern the crimes of conspiracy or smuggling in any substantial way.

The record contains an affidavit of a state investigator assigned to the Hudson homicide to the effect that he "has received no leads from [the U.S. District Court] transcript to be used in [the Hudson investigation] nor has that transcript been used by the investigating officers in this case in any respect." The deputy attorney general, initially assigned to the prosecution of defendant's case, also signed a declaration stating he only used the federal transcript for the purpose of determining whether defendant had received immunity for the charge of murder or conspiracy to murder Hudson, and that no further use was made of defendant's testimony and no investigative leads were derived from the transcript of the defendant Lawrence's testimony. Defendant's prior testimony was not introduced nor used against him in the conspiracy trial. The testimony was not used for investigative leads nor to provide any other aid or assistance to the prosecution. Defendant was not tried for the same transaction he had testified about. Consequently, defendant's testimony did not alter the "position" between himself and the government concerning the conspiracy charge. The People did not abridge defendant's immunity from federal and state use of the compelled testimony or its fruits. (*Gardner* v. *Broderick,* 392 U.S. 273, 276 [20 L.Ed.2d 1082, 1085, 88 S.Ct. 1913].) Succinctly stated, defendant's compelled testimony had no bearing or relation whatsoever to the murder conspiracy prosecution.

 Defendant finally maintains that it was prejudicial error for the court to permit a prosecution witness to testify over objection to some telephone conversations she had with Oldright within a few days after Hudson's killing. Defendant first charges that there was insufficient founda-

tion to introduce the conversation and, secondly, that section 1223 of the Evidence Code, relating to statements of coconspirators, is unconstitutional as denying defendant his right to confront and cross-examine witnesses.

The foundation was sufficient. The witness, April Owings—a girlfriend of the ring—initially testified as to a prior telephone conversation on October 10, 1968, wherein she was at Fassler's home in Tucson and received a telephone call from a man who identified himself as "Ken" [Oldright]. She testified she returned the call on October 16, 1968. During this second telephone conversation, she recognized the voice of the person "Ken" [Oldright]. The substance of the calls was as follows: During the October 10, 1968, conversation, Oldright asked for Fassler; she told him Fassler was not at home; Oldright told her to tell Fassler that it was very important that he call him; when Fassler returned to the house, she gave him the message and he called Oldright.

On October 19-20, she received a call from Fassler who said he was in the Nogales jail and wanted to know if a briefcase had been left with her; he also wanted to know if defendant had been around, and she said, "No."

On October 21, she received another call from Fassler; she again reported that defendant had not been there and a briefcase had not been left at the house; Fassler gave her Oldright's telephone number and told her to ask Oldright whether defendant had been there and picked up the money.

She called Oldright and he told her defendant had been there two days before; she asked Oldright whether he had any money, and he said that he would not help in any way because Fassler had double-crossed him before; he also said that defendant had picked up the money two days previously.

Consequently, the foundation for the last conversation in which Oldright reported that defendant had picked up the money taken from Hudson was established from the prior conversations Miss Owings had with Oldright. There was also proof that Oldright and Fassler subsequently met on November 8, 1968, and split up some of the other property or personal effects taken from Hudson's body. The trial court properly ruled that Oldright's statement was in furtherance of the conspiracy although it occurred after Hudson's murder. (See *People* v. *Suter,* 43 Cal.App.2d 444, 458 [111 P.2d 23]; *People* v. *Williams,* 30 Cal.App.2d 234, 239 [85 P.2d 974].) (7) Statements made by a coconspirator in furtherance of a conspiracy are admissible after a prima facie showing of proof of the

conspiracy. (*People* v. *Brawley*, 1 Cal.3d 277, 288-290 [82 Cal.Rptr. 161, 461 P.2d 361].)

As to the constitutional averment, defendant concedes that both the United States Supreme Court and the California Supreme Court have recently ruled that the hearsay exception allowing statements of a coconspirator during the concealment phase of a conspiracy does not violate the confrontation clause. (*Dutton* v. *Evans*, 400 U.S. 74, 81 [27 L.Ed.2d 213, 222, 91 S.Ct. 210]; *People* v. *Brawley, supra,* 1 Cal.3d 277, 288-290.) However, defendant maintains that "several points of argument used by the U. S. Supreme Court in reaching its decision (in *Evans, supra*) are not present here." In distinguishing the *Evans* facts from preceding cases in which the United States Supreme Court has held admission of hearsay evidence denied the right to confrontation, the court stated, "This case does not involve evidence in any sense 'crucial' or 'devastating,' as did all the cases just discussed. It does not involve the use, or misuse, of a confession made in the coercive atmosphere of official interrogation, as did Douglas, Brookhart, Bruton and Roberts. It does not involve any suggestion of prosecutorial misconduct or even negligence, as did Pointer, Douglas and Barber. It does not involve the use by the prosecution of a paper transcript, as did Pointer, Brookhart, and Barber. It does not involve a joint trial, as did Bruton and Roberts. And it certainly does not involve the wholesale denial of cross-examination, as did Brookhart." (*Ibid.,* p. 87 [27 L.Ed.2d at p. 226].)

In the same vein, defendant's prosecution for conspiracy to murder Hudson did not involve a confession, did not involve prosecutorial misconduct or negligence, did not involve a paper transcript, and did not involve a joint trial or, as in *Evans,* did not involve the wholesale denial of cross-examination. By analysis, the *Evans* factual situation is remarkably similar to the present case. In *Dutton* v. *Evans, supra,* 400 U.S. 74, the primary prosecution testimony came from an accomplice who had been granted immunity; one of the other 20 prosecution witnesses testified that the defendant's partner had told him while he was a federal prisoner, that " '[i]f it hadn't been for that dirty son-of-a-bitch Alex Evans, we wouldn't be in this now.' " (*Ibid.,* p. 77 [27 L.Ed.2d at p. 220].) In the present case, Rose was an accomplice in the conspiracy to murder Hudson and was granted immunity for his testimony; during the primary phase of the prosecution's case, 44 witnesses actually appeared at trial and were cross-examined; there were stipulations allowing the admission of the substance of the testimony of 21 other witnesses, as well as the reading of the testimony, including cross-examination, of 5 other witnesses. Thus, 70 witnesses

were either called by the prosecution or their testimony was read or stipulated to, only one of whom testified to the challenged statement made by Oldright. It necessarily follows therefrom that there was no "wholesale denial" to defendant of his right to cross-examine the witnesses against him.

Nor can the evidence that Oldright said defendant had picked up the briefcase and the money two days earlier be characterized as either "crucial" or "devastating." Defendant was convicted of conspiring to murder, not for the murder itself. ■ The essential element of conspiracy is the agreement to commit an unlawful act, although at least one overt act must also be shown. (*People* v. *Marsh,* 58 Cal.2d 732, 743 [26 Cal.Rptr. 300, 376 P.2d 300]; *People* v. *Marrone,* 210 Cal.App.2d 299, 307 [26 Cal.Rptr. 721]; Pen. Code, §§ 182, 184.) ■ Thus, the crucial evidence of defendant's guilt was Rose's testimony that defendant was present with Fassler, Oldright and Rose when the contract for Hudson's murder was formulated, and that defendant participated in the agreement. There was also evidence that defendant implicitly admitted his involvement when questioned by a T-V reporter. Another witness testified that defendant admitted he was "flabbergasted" when Fassler threw out the contract. Evidence as to defendant's acts *after* the murder, such as the telephone conversation, was merely cumulative to the extent that it showed a pre-existing agreement. Therefore, Miss Owings' conversation with Oldright was properly admitted as an exception to the hearsay rule, and did not abridge defendant's right to confront and cross-examine the witnesses against him.

The judgment is affirmed.

Gardner, P. J., and Tamura, J., concurred.