[Crim. No. 8309. Third Dist. Feb. 27, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH MICHAEL REMIRO et al., Defendants and Appellants.

---

**COUNSEL**

Richard K. Turner, James D. Garbolino, under appointments by the Court of Appeal, Alan V. Pineschi and Katherine Mader for Defendants and Appellants.

Evelle J. Younger, George Deukmejian, Attorneys General, Jack R. Winkler, Robert H. Philibosian, Chief Assistant Attorneys General, Arnold O. Overoye, Assistant Attorney General, Charles P. Just, Joel E. Carey and Eddie T. Keller, Deputy Attorneys General, D. Lowell Jensen, District Attorney, and John J. Meehan, Assistant District Attorney, for Plaintiff and Respondent.

---

**OPINION**

**PUGLIA, P. J.**—Defendants were convicted of the first degree murder of Oakland School Superintendent Marcus Foster and the attempted murder of Foster's deputy superintendent Robert Blackburn. The trial was lengthy, the record is voluminous and the contentions are numerous. For reasons which will appear, we shall affirm the judgment as to defendant Remiro and reverse as to defendant Little.

A brief summary of facts will provide overall context for the discussion. Additional facts will be set forth as necessary in conjunction with the separate treatment of the several contentions.

In the early evening of November 6, 1973, Superintendent Marcus Foster was shot and killed from ambush as he walked from his office to his automobile after a school board meeting. Deputy superintendent Robert Blackburn, who was with Foster at the time, was seriously wounded by a shotgun blast. Bullets removed from Foster's body had been hollowed out in the tip and filled with cyanide. The authorities made no public mention of the use of cyanide bullets.

On November 8, 1973, several bay area newspapers and a radio station received identical documents purporting to originate with the so-called Symbionese Liberation Army (SLA). The document bore a drawing of a seven-headed cobra below which were the letters SLA; entitled "Com-

munique No. 1," the document purported to order the execution of Foster and Blackburn by cyanide bullets and inveighed at length against, among others, the Oakland School Board, the "fascist ruling class" and the fascist government of Amerika [*sic*]."

In the early morning of January 10, 1974, a Chevrolet van driven by defendant Little in which defendant Remiro was a passenger was stopped for investigation by a police officer in Concord. In the ensuing confrontation, Remiro fired several shots at the officer from a .380 automatic pistol. Remiro escaped immediate apprehension but Little was arrested and the van seized. Inside the van were SLA documents. Later that morning Remiro was arrested. He was armed with a Walther .380 automatic pistol. This pistol was established at trial as the gun which fired five of the bullets removed from Foster's body and eight expended .380 shells found at the murder scene. One of the bullets removed from Foster's body and another bullet and empty shell found at the murder scene were possibly fired from a .38 caliber Rossi revolver owned by Little.

In the early evening of January 10, 1974, firemen extinguished a fire of incendiary origin at a house near Concord close to the site where Little and Remiro had been stopped earlier that morning in the Chevrolet van. Among the items discovered in the Concord house were firearms, ammunition, empty shells which had been fired from the .380 Walther and the .38 caliber Rossi, pipe bombs and Molotov cocktails, several SLA "communiques" (including the original of Communique No. 1 from which the copies received by the news media had been duplicated), a typewritten list containing the names and addresses of the five news organizations to which Communique No. 1 had been sent, a hand-drawn map of the Foster ambush-murder scene, Oakland School District publications from which Foster's photograph had been torn out, a document containing the time and date of the school board meeting following which Foster had been killed, cyanide bullets similar to those which killed Foster and the materials with which they were made, and a shotgun shell which had been fired from or at least worked through the same shotgun which wounded Blackburn. Fingerprints of both defendants and of avowed SLA members Donald DeFreeze, Patricia "Mismoon" Soltysik, and Nancy Ling Perry were found on various documents seized in the house. A wallet containing personal identification papers of Little and other papers bearing his name were found in a bedroom of the Concord house.

The Chevrolet van was registered to N. G. Ling, the maiden name of Nancy Ling Perry. Both defendants had been observed working on the van in the driveway of the Concord house. The house had been rented to Nancy Ling Perry and Little using the aliases Nancy and George DeVoto. Both defendants had been seen around the property during the past several months. Each of them carried keys to the house.

Both defendants were shown to have been associated with other avowed SLA members during the past two years, including DeFreeze, Soltysik, Perry, Angela Atwood, Camilla Hall and Willie Wolfe. The latter six individuals perished in May 1974 when the house from which they were engaging Los Angeles police in a gun battle caught fire and was completely incinerated. Found in the ashes of the Los Angeles house, next to the outstretched hand of the dead Nancy Ling Perry, was Little's .38 caliber Rossi revolver; also found were a number of sawed-off rifles, the separated barrels of which had earlier been recovered from the Concord house, a shotgun which Remiro had purchased in Oakland in 1973 and various other guns and ammunition. Several of the weapons found in the Los Angeles ruins had fired some of the expended shells which had been found in the Concord house.

The prosecutor sought to prove that even though defendants may not have been the trigger men, they were members of a criminal combination which planned and executed the shootings of Foster and Blackburn as part of a larger conspiracy to wage war, in the words of the SLA manifesto, on the "Fascist United States Government, The Facist [*sic*] Capitalist Class" and their supporters by means of terroristic acts including murder and kidnapping of officials and prominent members of the community, thereby fomenting violent upheaval and promoting revolutionary change.

Neither defendant testified. Following a trial which consumed 46 court days spread over 71 calendar days in which 137 different witnesses were called and over 500 exhibits offered into evidence, defendants were each convicted of first degree murder and attempted murder.

## I. Gainer Instruction

By far the most troublesome of the numerous contentions raised by defendants involves an instruction given to the deliberating jury and later disapproved by the Supreme Court in *People* v. *Gainer* (1977) 19 Cal.3d 835 [139 Cal.Rptr. 861, 566 P.2d 997], decided more than two years after

the trial in this case. The instruction is frequently referred to as the "dynamite charge" or the *"Allen"* instruction after the case in which it was first approved, *Allen* v. *United States* (1896) 164 U.S. 492 [41 L.Ed. 528, 17 S.Ct. 154].

This case was submitted to the jury on May 30, 1975. After having deliberated 10 days, the jury reconvened in the courtroom at 9 a.m., on June 9, and the following proceedings took place:

"THE COURT: The record may reflect the jurors are present and in their proper places, and the two accused persons are present in court.

"Mr. Foreman, you reported to me a figure yesterday that the jury had ballotted [*sic*]; and once again I—of course, it is my duty to admonish you that the Court, as well as counsel and anyone else other than the jury, are not entitled to know how the jury leans, whether for innocence or for guilt, but in this case the Court gave to you eight possible verdicts.

"First, I'd like to know whether or not the jury has voted on more than one of those?

"FOREMAN: Your Honor, the eight possible verdicts, the jury has rejected two and adopted two.

"THE COURT: In other words, you have a unanimous opinion as to two, is that correct?

"FOREMAN: That is correct, Your Honor.

"THE COURT: And two you have rejected, is that true?

"FOREMAN: That is correct.

"THE COURT: Okay. Can you tell me this: Do these that you vote on pertain to one or both of the defendants?

"FOREMAN: The verdicts which the jury has reached, Your Honor,—

"THE COURT: I don't want to know which ones. I just want to know whether—

"FOREMAN: Both concern a single defendant.

"THE COURT: I see. Those that you have resolved pertain to one of the defendants, is that correct?

"FOREMAN: That is correct, Your Honor.

"THE COURT: And, I take it, the other two [*sic*] pertain to the other defendant?

"FOREMAN: That is correct, Your Honor. Your Honor, the most recent ballot which was taken yesterday reflected numerical count of three to nine.

"I believe the jury is of the opinion that there may be a potential impasse, and we would appreciate any further guidance or instruction the Court might want to give.

"THE COURT: Well, I'm going to read to you a statement that has been helpful to juries in other cases, and possibly may be of assistance to you, and it is as follows: . . ."

Without consulting counsel, the court then read an instruction containing both the objectionable features expressly condemned in *People* v. *Gainer,* i.e., an admonition to minority jurors to reevaluate their positions in light of the views of the majority and an assertion that the case at some time must be decided.[1]

---

[1]The complete text of the instruction as given follows: "In a large proportion of cases and, perhaps, strictly speaking, in all cases, absolute certainty cannot be attained or expected.

"Although the verdict to which a juror agrees must, of course, be his own verdict, the result of his own convictions, and not a mere acquiescence in the conclusion of his or her fellows, yet in order to bring twelve minds to a unanimous result, you must examine the questions submitted to you with candor, and with a proper regard and deference to the opinions of each other.

"You should consider that the case must at some time be decided, that you are selected in the same manner and from the same source from which any future jury must be selected, and there is no reason to suppose the case will ever be submitted to twelve men or women more intelligent, more impartial, or more competent to decide it, or that more or clearer evidence will be produced on the one side or the other. And with this view it is your duty to decide the case, if you can conscientiously do so.

"In order to make a decision more practicable, the law imposes the burden of proof upon the State to establish every part of their case to a moral certainty and beyond a reasonable doubt, and the State of California—pardon me—and if in any part of it you are left in doubt, the defendant is entitled to the benefit of the doubt and must be acquitted.

"But in conferring together, you ought to pay proper respect to each other's opinions, and listen with a disposition to be convinced to each other's arguments.

"And, on the other hand, if much of the larger number of your panel are for conviction, a dissenting juror should consider whether a doubt in his or her own mind is a reasonable one, which makes no impression upon the minds of the many men or women equally honest, equally intelligent with himself or herself, and to have heard the same evidence with the same attention and equal desire to arrive at the truth and under the sanction of the same oath.

"On the other hand, if a majority are for acquittal, the minority ought to seriously ask themselves whether they may not reasonably and ought not to doubt the correctness of the judgment which is not concurred in by most of those with whom they are associated, and distrust the weight or sufficiency of that evidence which fails to carry conviction in the minds of their fellows.

"This is given to you as a suggestion of the theory and rationale behind jurors coming to a decision one way or the other. . . ."

Deliberations then resumed extending throughout the day. At 6:30 p.m. on June 9, the jury returned to the courtroom. After some discussion, the court reread two instructions, CALJIC Nos. 1.00 and 17.40.[2] The foreman indicated that the instructions were sufficient and asked to resume deliberations. At 6:37 p.m., the jurors retired. They returned to the court at 7:04 p.m. at which time verdicts of guilty were rendered against each defendant for first degree murder and attempted murder. The verdicts against Remiro were dated June 8, 1975; those against Little were dated June 9, 1975. Each verdict was read in its entirety and the jurors were individually polled, each affirming the verdicts as his or her own.

On August 31, 1977, the Supreme Court decided *People* v. *Gainer, supra,* holding "as a judicially declared rule of criminal procedure" (19 Cal.3d at p. 852) that the giving of an *Allen*-type instruction encouraging minority jurors to reexamine their independent views in light of the majority position constitutes error, and because of the difficulties inherent in attempting to ascertain from a given record whether prejudice did in fact occur, the error is deemed to be reversible per se. (*People* v. *Gainer, supra,* 19 Cal.3d at pp. 854-855.) The *Gainer* court also held that informing the jury that the case at some time must be decided misstates the law and therefore constitutes error (at p. 852), albeit not per se prejudicial (p. 855). Furthermore, the *Gainer* decision is made applicable to all cases not yet final as of its date, August 31, 1977 (p. 853). We are of course bound to follow the *Gainer* decision as we are all other decisions of our Supreme Court. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

We have no difficulty in concluding that the *Gainer* decision is irrelevant to the appeal of Remiro, because it is evident that the jury had already concluded its deliberations with respect to Remiro before the

---

[2]CALJIC No. 17.40 as given by the court provided: "Both the People and the defendants are entitled to the individual opinion of each juror.

"It is the duty of each of you to consider the evidence for the purpose of arriving at a verdict, if you can do so.

"Each of you must decide the case for yourself, but should do so only after a discussion of the evidence and the instructions with the other jurors.

"And you will notice there it doesn't say there the manner in which that discussion is had, just in open assembly.

"You should not hesitate to change an opinion, if you are convinced it is erroneous. However, you should not be influenced to decide any question a particular way because a majority of the jurors, or any of them, favor such a decision."

The Supreme Court has urged the continued use of CALJIC No. 17.40, noting that it contains none of the objectionable features of the usual *Allen* charge. (*People* v. *Gainer* (1977) 19 Cal.3d 835, 856 [139 Cal.Rptr. 861, 566 P.2d 997].)

giving of the erroneous instruction on June 9. By the foreman's account, when the jury reconvened to deliberate at 9 a.m. on June 9th, it had already unanimously arrived at two verdicts concerning one of the defendants. The identity of that defendant was established circumstantially when the verdicts were returned in open court later on June 9, and it was revealed that those against Remiro were dated June 8, the date preceding the giving of the erroneous instruction. The verdicts against Little were dated June 9. That these dates were not inaccurate can be inferred from the court's instruction that the verdicts "shall" be dated "as soon as all of you have agreed upon [them]," and from each juror's individual affirmation in open court that the verdicts so dated were his or her own. Thus the *Allen* instruction did not skew the jury's deliberations as to Remiro toward the result favored by the majority; those deliberations were concluded before the jurors heard the erroneous instruction.

It is of course possible, as counsel for Remiro speculates, that the jury reopened deliberations on the Remiro verdicts after the *Allen* instruction was given; however, that possibility, theoretical only, finds no support in the record. If deliberations were reopened, it must of necessity have been on June 9th. Yet the Remiro verdicts were dated June 8th, and that date was affirmed in open court by each juror. The jury was instructed to date the verdicts as soon as agreed upon and we must presume that official duty has been performed (Evid. Code, § 664).

We emphasize that our analysis of the impact vel non of *Gainer* on Remiro's appeal does not constitute an attempt "to gauge the precise effect" (19 Cal.3d at p. 854) on the jury of the erroneous admonition to minority jurors, an exercise forbidden to appellate courts by the *Gainer* decision (p. 855). Rather, the record demonstrates, and we so find, that the erroneous instruction could have had no effect, prejudicial or otherwise, on the Remiro appeal simply because by the time it was given the jury had completed its deliberations and arrived at verdicts of guilty as to Remiro.

Defendant Little's situation is sufficiently distinguishable from that of Remiro that he will fortuitously reap the benefit of the *Gainer* decision, not because justice requires it but because chance has ordained it. For many years, our system of criminal justice has been noted less for predictability than for instability. Judicial decisions often abruptly discard long-established procedures and replace them with new rules. Typically, these new rules are then applied to cases on appeal which were earlier tried in reliance upon the then existing but now discredited rule.

In other words, the rules are changed to the benefit of the defendant and the detriment of the People after the game has been played. The inevitable consequence is the ex post facto creation of error where none otherwise would exist, and the unfortunate reversal of many convictions that would otherwise have been affirmed. These occurrences assuredly exact a considerable cost in loss of public confidence in the judicial system, not to mention the very tangible economic drain on public funds resulting from the retrial of these cases. And public confidence is even further eroded when intervening events render retrial impossible or futile.

The instant case provides an all too common example of retroactive application of a judicially fashioned rule announced after trial of the case. Here, however, the trial was in 1975. The inordinate length of the trial and the consequent time required by the parties to brief the voluminous record on appeal have delayed finality of this judgment. It is more than a little ironic that if this case had involved a typical felony conviction, for example, a run-of-the-mill case of burglary, robbery or theft, the appeal, if any, would have been concluded and the judgment in all likelihood would have been final before *Gainer* was decided and therefore would have been insulated from its retroactive sweep.

We do not challenge the wisdom of the *Gainer* decision substantively, or the right and duty of the courts to effect appropriate changes in the law by judicial decision. We do respectfully suggest, however, that natural law would not be affronted by the conviction and punishment of Little under this judgment, since he was fairly tried under then established, sanctioned procedures. Surely it must be possible to effect orderly change in judicial procedures without the attendant carnage that retroactivity has wreaked over the past two decades, a period in which the judicial landscape, resembling nothing so much as a giant junkyard, has been cluttered with the wreckage of convictions fairly won but sacrificed to the fetish of our highest courts for after-acquired wisdom. The tarnished image of the judiciary today is in significant part attributable to the socially destabilizing effect of wholesale reversals of criminal convictions for failure to comply with rules that did not even exist at the time of trial. Certainly the maintenance of public acceptance of a system largely responsible for the protection of individual rights is no less important than the rights themselves.

Many others in California whose trials were infected with what we now know to be *"Gainer* error" have been and are still being punished under

valid judgments which became final before *Gainer* was decided. More-over, many other states and most parts of the federal judicial system even now approve of the *Allen* type instruction (*People* v. *Gainer, supra,* 19 Cal.3d at p. 860 (dis. opn. of Clark, J.)). That Little will escape punishment at least under this conviction and perhaps altogether therefore has less to do with justice than with random luck.

Inasmuch as this case has understandably attracted great public interest and concern, we have taken pains to explain in some detail why the conviction of one of the defendants must be reversed. We now proceed to that distasteful task.

■ We reject the Attorney General's claim of invited error predicated upon the express consent of Little's counsel that a written copy of the *Allen* instruction already given by the trial court be provided the jury to take into the jury room. Counsel's consent came immediately after the trial judge, without consulting counsel, read the *Allen* instruction to the jury. Even if counsel had known that the instruction was error (see *Gainer,* at p. 846, and cases cited thereat), he had no opportunity to object before the instruction was read (p. 842, fn. 2). By the time counsel was asked if he objected to a written copy of the instruction for the jury it was too late to object; the action had already been taken. Moreover, the record does not affirmatively show or even suggest that counsel's assent manifested a conscious choice of tactics.

■ Respondent further contends that the error in giving the *Allen* instruction was rendered harmless by the court's later admonition to the jurors not to surrender an independent opinion merely because it was not shared by a majority of the jurors. It is true that the trial judge instructed in terms of CALJIC No. 17.40 (see fn. 2, *ante,* p. 820) less than an hour before the verdicts were returned, just as he had earlier so instructed before the jury commenced its deliberations. Thus, the jury received an instruction essentially contradictory to the prejudicially erroneous por-tions of the *Allen* instruction both before and after the latter was given. We are urged to infer primarily from the close proximity between the return of the verdicts and the second curative instruction that the impermissible considerations introduced into the deliberations by the *Allen* instruction were neutralized. We decline to indulge the suggested inference, however, because as the *Gainer* court recognized, it is impossible on an appellate record "to gauge the precise effect" (*People* v. *Gainer, supra,* 19 Cal.3d at p. 854) of the erroneous instruction on the jury. Accordingly, we cannot assume the jury was not improperly

influenced by the *Allen* instruction in its deliberations as to Little. For these reasons, the judgment against Little must be reversed.

## II. Motion to Suppress Evidence

In a pretrial hearing lasting 10 days, defendants sought to suppress all evidence obtained as a result of their detention after they were accosted in the Chevrolet van, all evidence seized in the Concord house and certain evidence removed from their persons in a booking search. Their motions were denied.

At about 1:30 a.m. on January 10, 1974, Concord Police Sergeant David Duge was driving his unmarked police car through a residential neighborhood; he observed a reddish-orange Chevrolet van slowly approach and stop at a stop sign, proceed through the intersection and continue slowly at about 10 to 15 miles per hour in a 25-mile per hour zone. Duge followed at a distance as the van traveled slowly in a circle throughout the neighborhood. Duge had worked the area for the past eight months and was familiar with local traffic patterns. He knew that on weeknights people on the street at this hour were usually purposefully headed home from a swing shift at work. Duge also knew that a large number of residential and automobile burglaries and thefts had been reported in the neighborhood. He knew vans were often used in burglaries. Duge was familiar with vehicles which frequented the area and this van was unfamiliar to him; its slow speed and circular route were suggestive of a "casing" operation in preparation for a burglary or theft. Accordingly, when the van had traveled full circle and reached the point at which he had first noticed it, Duge pulled the vehicle over.

Duge, in uniform, approached the driver and asked for his operator's license. The driver, Little, tendered a California driver's license bearing the name "Robert James Scalise" and an Oakland address; he asked why he was being stopped. Duge replied he wanted to talk to Little about his suspicious driving; Little gave no reply. The officer then asked the passenger, Remiro, for some identification; Remiro produced a driver's license bearing his own name and an Oakland address. Little told Sgt. Duge that he and Remiro were looking for a friend in the area. When asked for the friend's identity, Little muttered something unintelligible; when asked again he replied they were looking for "DeVoto" on Sutherland Court. Defendants had just driven past Sutherland Court as Duge was following them. Although claiming to be lost, neither defendant asked the officer for assistance.

Duge returned to his patrol car where he ran a warrant check on "Scalise" and Remiro, and had the dispatcher check the cross-directory for a DeVoto on Sutherland Court. Within minutes the dispatcher reported there were no outstanding warrants under either name and the directory showed no DeVoto on Sutherland Court.

Duge knew that Concord experiences a high rate of theft and burglary committed by out-of-towners who "hit" in the suburbs and then flee back to large urban areas like Oakland. Confronted with out-of-town addresses, the apparent absence of a DeVoto on Sutherland Court, and the other information known to him, Duge decided to talk to the passenger. He approached the passenger side of the vehicle, tapped on the window and asked Remiro to step out so he could talk to him. Remiro stepped out.

Duge feared for his safety because his cover unit had not yet arrived and he was outnumbered by at least one person with the possibility that more were concealed from his view in the van. Consequently, Duge asked Remiro if he had any weapons and advised him that he was going to frisk him. Remiro stepped back and pulled open his jacket, revealing on his right hip a bulge Duge recognized as the handle of an automatic pistol. As Duge ran for cover, Remiro fired two shots at him. Duge returned the fire and was shot at two more times. As Remiro fled on foot he fired one more shot at Duge. The van speeded away and disappeared from view. Duge transmitted an emergency radio call for help.

As Officer Lee arrived shortly thereafter, the van reappeared a block or so away. The two officers stopped the van and arrested defendant Little at gunpoint. Little pointed out and Lee observed in plain view a handgun inside the van on the engine cover. Lee opened the cargo door on the passenger side, looked inside for passengers, and discovered none.

Concord Police Officer Breuker next arrived on the scene. He looked into the van from the driver's side and saw the pistol. Unaware that Officer Lee had already checked the van for occupants, he looked into the open cargo doors, and took a number of pictures showing the position of the pistol which he then seized as evidence. Breuker checked the van for additional evidence of the shooting. On the step of the driver's door he found a wallet which contained a social security card of "Scalise." In the rear of the engine compartment, he found a brown paper bag, crimped at the top. Inside the bag, Breuker observed a large stack of papers; the top sheet bore an unusual drawing and the legend, "Symbionese Liberation

Army." In a brown paper bag behind the driver's seat was a fully loaded, break-apart rifle. Aware that a group calling itself the Symbionese Liberation Army had claimed credit for the assassination of an Oakland school official, Breuker reported his observations to his superior officer. The van was sealed and searched later that morning pursuant to a search warrant obtained on the strength of the foregoing information. Among the items seized under the warrant was a large amount of SLA literature.

Little was taken to the police station and booked. Included in his property was a set of eight keys on a chain. Remiro was found hiding behind a parked vehicle on Sutherland Court and was apprehended by Concord police officers at about 5:30 a.m. on January 10, 1974. On his person was a .380 Walther automatic pistol. He was transported to the police station, booked, and a set of keys was removed from his person.

At 6:26 p.m. on January 10, 1974, Contra Costa County firemen arrived at the house located at 1560 Sutherland Court to combat a structural fire. The fire was controlled at 6:29 p.m.

Fire Captain Spomer arrived at 6:31 p.m. Spomer was informed that a five-gallon gasoline can had been found inside the house and that there had been a flash fire. He entered the house to look for victims and identification of occupants as well as to open up the house for ventilation due to the heavy concentration of smoke. Inside Spomer noted a strong odor of gasoline and observed that all the doors to the hallway had been removed, thus facilitating a draft and permitting the fire to spread more quickly. Spomer suspected arson. He observed Molotov cocktails, assorted ammunition and weapons, stacks of papers on the floors, in the bathtub and elsewhere, and revolutionary literature on the bedroom walls. Searching for identification, Spomer saw an open desk drawer; inside he observed a document entitled "Communique No. 3, Symbionese Liberation Army." The communique concerned the execution of correctional officers, their wives, and others. Aware of the shootout involving Officer Duge and the discovery of SLA materials in the van, Spomer notified the Concord Police Department of his findings.

Captain Tamborski of the Concord Police Department arrived at 1560 Sutherland Court around 7:30 p.m. after being advised of the suspected arson and the discovery of the SLA material. Tamborski entered the house to investigate the suspected arson. In one of the bedrooms, Tamborski seized a wallet and an envelope bearing the name of Russell

Jack Little. Tamborski noticed a heavy aroma of gasoline in the house. Fearing for his safety, he exited a minute or two after entering.

At that point Tamborski was informed the house was outside the Concord city limits. He therefore informed the Contra Costa Sheriff's Department of the suspected arson. Between 7:30 and 8 p.m., Tamborski reentered the house accompanying a bomb squad and sheriff's personnel. Tamborski's stated purpose for reentering was to look for evidence that might relate to the Duge shootout because at that point the arson investigation had been taken over by the Contra Costa Sheriff's Department. While inside the house, Tamborski observed a cardboard box containing two galvanized pipe bombs. He pointed them out to the bomb squad leader.

Marion Horner was the owner of 1560 Sutherland Court. In October 1973, he had rented the house to Nancy Ling Perry and Little posing as Nancy and George DeVoto. "George DeVoto" paid the rent on November 1, 1973. At the time of the fire the rent had been paid through February of 1974.

Horner arrived at the scene at approximately 7 p.m. He was informed that arson was suspected. From information provided by several neighbors at the scene, he determined that just prior to the fire a heavily laden automobile "bottomed out" on the driveway and sped from the premises after one of the passengers, a tenant, threw something into the garage; moments later an explosion blew out the dining room windows. "Nancy DeVoto" had not been seen or heard from since the automobile's departure. Presuming the house abandoned, Horner took possession of the premises. Later that evening he gave oral and written consent for the Contra Costa Sheriff's office and the Oakland Police Department to conduct a search of the premises.

Sergeant John Agler of the Oakland Police Department was in charge of the investigation of the Marcus Foster murder. In the early hours of January 10, 1974, Agler learned of the shooting incident in Concord involving Sergeant Duge. Agler was informed of the fire at 1560 Sutherland Court at about 10 p.m., January 10; he was told that SLA information had been discovered inside the house. At the scene he was informed that arson was suspected and that explosive substances and a communique threatening the lives of prison officials and their families had been found inside the house. Agler was shown the consent to search executed by Horner.

Although Agler believed that an emergency situation existed and that it was necessary to go inside the house, he decided nonetheless to delay the search until a warrant could be procured. After receiving the search warrant, Agler went through the house and seized a number of items, some of which have been described hereinbefore in the statement of facts.

## A. Detention of Defendants.

▇ Defendants challenge the stop of the van and the intrusiveness of the detention that followed. "[A] reasonable suspicion of involvement in criminal activity will justify a temporary stop or detention" even though the circumstances are also consistent with lawful activity. (*In re Tony C.* (1978) 21 Cal.3d 888, 894 [148 Cal.Rptr. 366, 582 P.2d 957].) Officer Duge stopped the van because he suspected the possible involvement of the occupants in criminal activity. His suspicions were objectively supported by the unusually slow speed of the vehicle (*Williams* v. *Superior Court* (1969) 274 Cal.App.2d 709, 712 [79 Cal.Rptr. 489]), the lateness of the hour (*People* v. *Rosenfeld* (1971) 16 Cal.App.3d 619, 622 [94 Cal.Rptr. 380]), the frequency of burglaries and thefts from vehicles in the area (*Rosenfeld, supra,* at p. 622), and the circuitous route of the van through the neighborhood, suggesting to Duge the occupants were "casing" the area preparatory to some criminal activity (*People* v. *Jackson* (1968) 268 Cal.App.2d 306, 310 [74 Cal.Rptr. 40]). Strong weight must be given to the officer's experience and familiarity with the area (*People* v. *Cowman* (1963) 223 Cal.App.2d 109, 117-118 [35 Cal.Rptr. 528]). Duge had patroled the neighborhood for eight months; he was generally familiar with vehicles which frequented the area and did not recognize the van as one of them (see *Bramlette* v. *Superior Court* (1969) 273 Cal.App.2d 799, 804 [78 Cal.Rptr. 532]); he knew that vans were commonly used by professional burglars. The investigative stop of the van was legally justified.

An investigative detention exceeds constitutional bounds when extended beyond what is reasonable under the circumstances that justified its initiation. (*Willett* v. *Superior Court* (1969) 2 Cal.App.3d 555, 559 [83 Cal.Rptr. 22].) "No hard and fast rule can be formulated for determining the reasonableness of the period of time elapsing during a detention. The dynamics of the detention-for-questioning situation may justify further detention, further investigation, search, or arrest." (Fn. omitted; *Pendergraft* v. *Superior Court* (1971) 15 Cal.App.3d 237, 242 [93 Cal.Rptr. 155].)

Duge suspected he was dealing with automobile burglars. His initial confrontation with defendants reasonably heightened his suspicion. Both defendants had Oakland addresses suggesting to Duge they fit the pattern of transient predator common to the area; Little's identification of the "friend" for whom he was looking was equivocal; the fact he was looking for Sutherland Court, had driven past it but did not request the officer's assistance provided further grounds for suspicion. At that point Duge was justified in seeking verification and additional information from his radio dispatcher. Although there were no outstanding warrants for Remiro or "Scalise," the fact that the residence of a DeVoto on Sutherland Court could not be verified warranted further inquiry. At this point the detention had lasted no more than five minutes.

■ As part of a lawful detention, a police officer may request a suspect to alight from a vehicle if the circumstances warrant it (*People* v. *Mickelson* (1963) 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658]). It is warranted where the officer's safety is involved. (*People* v. *Nickles* (1970) 9 Cal.App.3d 986, 991-992 [88 Cal.Rptr. 763].) "[E]ven inchoate and unparticularized suspicion that it would be better for the officer's safety for the passenger to alight is sufficient to justify such a request, because merely stepping out of a vehicle is a minimal intrusion upon privacy, . . ." (*People* v. *Beal* (1974) 44 Cal.App.3d 216, 221 [118 Cal.Rptr. 272].)

In the presence of suspected felons, Duge was apprehensive for his safety. His concern was magnified by the fact that he was alone and did not know if there were other people concealed in the rear of the van. Under all the circumstances, his decision to frisk Remiro for weapons was reasonable. (*People* v. *Mickelson, supra,* 59 Cal.2d at pp. 450-451; *People* v. *Beal, supra,* 44 Cal.App.3d at p. 221; cf. *People* v. *Superior Court (Simon)* (1972) 7 Cal.3d 186, 208 [101 Cal.Rptr. 837, 496 P.2d 1205].)

The investigative stop and detention of defendants was reasonable both in its initiation and its scope.

B. Prewarrant Search of the Van.

■ Police officers may search a vehicle without a warrant where they have reasonable cause to believe it has contraband or evidence of crime or is itself an instrumentality of the commission of a crime, because there is no distinction of constitutional significance between an immediate search and the immobilization of the vehicle until a warrant is obtained. (*Chambers* v. *Maroney* (1970) 399 U.S. 42, 48-52 [26 L.Ed.2d 419, 426-429,

90 S.Ct. 1975]; *People* v. *Laursen* (1972) 8 Cal.3d 192, 201 [104 Cal.Rptr. 425, 501 P.2d 1145].)

When Breuker searched the van he was aware that one suspect was in custody at the scene, an armed suspect was at large possibly in the area, there was a pistol in the van and the van had been involved in the gun battle. It was therefore reasonable to believe, as Breuker did, that the van contained more evidence of the crime as well as evidence helpful in the apprehension of Remiro who was at large and known to be armed and dangerous (see *People* v. *Laursen, supra,* 8 Cal.3d at p. 201). The circumstances permitted a warrantless search of the vehicle. Moreover Little's gun and the wallet and identification of "Scalise" were not the product of a search, both having been in plain view of the seizing officer.

C. Search of the House at 1560 Sutherland Court.

Within an hour and a half after the arrival of the fire department at the Sutherland Court house, Fire Captain Spomer and Police Captain Tamborski had each entered the house twice. The fire department had arrived at 6:26 p.m. Although the fire was brought under control minutes thereafter, a unit remained at the scene until 6:30 the following morning in case the fire had not been completely extinguished. The entries of Captains Spomer and Tamborski occurred between 6:30 and 8 p.m. on January 10.

Officials may enter a structure without a warrant to extinguish a fire and may remain a reasonable time after the blaze has been extinguished to investigate the cause thereof. The warrantless seizure and observation of evidence while in the premises to suppress the fire or determine its cause are constitutional. (*Michigan* v. *Tyler* (1978) 436 U.S. 499, 509-510 [56 L.Ed.2d 486, 498-499, 98 S.Ct. 1942]; *Romero* v. *Superior Court* (1968) 266 Cal.App.2d 714, 719-720 [72 Cal.Rptr. 430].)

The entries of Spomer and Tamborski into the house were related to the fire, its control and causes and the neutralization of conditions therein rendered even more dangerous by the fire, e.g., the presence of Molotov cocktails and other explosives. These entries without a warrant were proper; once inside the officers could lawfully seize items in plain view that constituted contraband or evidence. Little's wallet and the envelope bearing his name constituted evidence of occupancy of the house; accordingly Tamborski was justified in seizing them.

Tamborski's second entry into the house accompanying the sheriff's bomb squad was additionally justified by other exigent circumstances (see *Warden* v. *Hayden* (1967) 387 U.S. 294, 298 [18 L.Ed.2d 782, 787, 87 S.Ct. 1642]). The known presence in the house of bombs and volatile substances created an emergency situation that justified a warrantless entry (*Romero* v. *Superior Court, supra,* 266 Cal.App.2d at pp. 716-717; *People* v. *Superior Court (Peebles)* (1970) 6 Cal.App.3d 379, 382-383 [85 Cal.Rptr. 803]). Moreover Tamborski was aware of the Foster murder, Duge's gun battle with Little and Remiro, probable SLA involvement in both violent incidents and the apparent association of Little and the SLA with the Sutherland Court premises; he had also been informed of the contents of Communique No. 3 threatening the murder of correctional employees and their families. Thus Tamborski had reason to link the house with an ongoing criminal conspiracy involving the gravest crimes, both past and prospective. The actual existence of such a conspiracy and its murderous objectives had already been demonstrated beyond dispute.

■ The gravity of the offense is a relevant factor in determining whether an emergency exists. (*People* v. *Sirhan* (1972) 7 Cal.3d 710, 739 [102 Cal.Rptr. 385, 497 P.2d 1121].) Where circumstances reasonably justify the apprehension that a criminal conspiracy constitutes an imminent threat to life "it is essential that law enforcement officers be allowed to take fast action in their endeavors to combat such crimes." (*Ibid.*) The suspected presence of evidence of such a conspiracy in the Sutherland Court house justified Tamborski's entry on the premises and the seizure of such evidence. (*Ibid.*)

So far as the record shows, the house was not again entered until around 3 a.m. on January 11, when Sergeant Agler of the Oakland Police Department executed the search warrant for the premises. ■ Defendant's sole objection to the warrant is that it is overbroad in purporting to authorize the seizure, inter alia, of "revolutionary material."

All that is required is reasonable particularity in the description in a search warrant of items to be seized. (*People* v. *Barthel* (1965) 231 Cal.App.2d 827, 832 [42 Cal.Rptr. 290].) Here the officers were confronted with an emergency such that inordinate delay might well precipitate mortal consequences. Under the circumstances a more precise description of some of the items subject to seizure could not reasonably be required. (*United States* v. *Scharfman* (2d Cir. 1971) 448 F.2d 1352, 1355, cert. den., 405 U.S. 919 [30 L.Ed.2d 789, 92 S.Ct. 944].) Moreover, it would be unreasonable in those circumstances to require the officer to delay to

engage in more extended investigation where the situation demanded alacrity (*Halpin* v. *Superior Court* (1972) 6 Cal.3d 885, 901-902 [101 Cal.Rptr. 375, 495 P.2d 1295] (conc. opn. of Mosk, J.)). Hence the generic description of "revolutionary materials" was adequate.

Under the circumstances the authorities cited by defendants imposing the requirement of more particularized description of items to be seized under a warrant where First Amendment rights are involved are inapposite. The revolutionary materials to be seized under this warrant, although writings, were sought not for the ideas they communicated nor in connection with any literary properties they may have had but for their evidentiary value as proof of a criminal conspiracy. (See *Stanford* v. *Texas* (1965) 379 U.S. 476, 485, fn. 16 [13 L.Ed.2d 431, 437, 85 S.Ct. 506]; *United States* v. *Scharfman, supra,* 448 F.2d at p. 1354.)

Assuming arguendo that the search warrant was invalid in the respect urged by defendants, the items seized by Sgt. Agler including the so-called "revolutionary materials" were nevertheless the product of a lawful search. Putting aside the search warrant, there were other bases, i.e., emergency and consent, upon which Sgt. Agler's search of the Sutherland Court premises was justified.

### 1. Emergency.

The emergency created by the existence of a criminal conspiracy constituting an imminent threat to human life has already been discussed as justification for Captain Tamborski's second entry into the premises. Sgt. Agler was in charge of the investigation into the Foster murder and was more intimately acquainted with the SLA and its activities than Tamborski. Knowledge of the details of the Foster killing and of the contents of SLA Communique No. 1 issued in its aftermath led him to believe the SLA was engaged in a conspiracy to assassinate public officials.[3]

[3]Communique No. 1 "serve[d] notice on the fascist Board of Education and its fascist supporters that [the SLA has] issued a Death Warrant on All Members [of the school board] and Supporters" of an Oakland School District plan to increase security measures in the public schools to combat violence and vandalism. But for the murder of Superintendent Foster, Communique No. 1 might otherwise have been dismissed as puerile posturing and bluster by a group of pathetic social misfits. However, in the stark light of reality, it took on an especially ominous and sinister aspect, posing a concrete and imminent threat of violent death to every member of the Oakland School Board and others in the community who might be regarded as their supporters. It was a threat the police could not and the courts should not ignore.

By the time he arrived at Sutherland Court on January 10, Sgt. Agler knew of the shooting incident involving Sgt. Duge and the consequent arrest of two suspects, one of whom was armed with a Walther pistol; he knew that such a weapon had killed Foster; Agler had already compared cartridge casings ejected at the scene of the Duge shootout with those recovered from the scene of the Foster murder and determined the firing pin impressions on the primers were the same. Agler was also aware that SLA literature had been found in the Chevy van and in the Concord house; he had compared the literature found in the van with the Foster communique and observed the common use of identical seven-headed cobras.

Agler was informed that explosive devices had been found at the Concord house; that the fire was of incendiary origin; that a tenant of the house had exited, thrown objects into the house and departed just before it caught fire; and that no one had since returned to the house.

Agler also knew that at least three suspects were directly involved with the Foster killing but only two suspected of SLA involvement, Little and Remiro, were then in custody. Agler was aware that an SLA communique threatening the execution of correctional officials and their families with cyanide bullets had been found in the house.

Considering the demonstrated capacity of the SLA to carry out its murderous designs, Agler's belief that a continuing conspiracy in fact existed to perpetrate additional murders was reasonably grounded. In our view the exigencies confronting Agler and his fellow officers were even more compelling than those described in *People* v. *Sirhan, supra,* where "the mere possibility that there might be . . . evidence [of a conspiracy to assassinate prominent political leaders] in the [defendant's] house fully warranted" a search of the house. (*People* v. *Sirhan, supra,* 7 Cal.3d at p. 739.)

2. Consent.

After talking with firemen and observers at the scene, Marion Horner took possession of his property and consented to its search. Sgt. Agler had been shown Horner's written consent before he conducted the warrant search.

Abandoned property is subject to search and seizure without a warrant. (*Abel* v. *United States* (1960) 362 U.S. 217, 241 [4 L.Ed.2d 668,

687, 80 S.Ct. 683]; *People* v. *Smith* (1966) 63 Cal.2d 779, 801 [48 Cal.Rptr. 382, 409 P.2d 222].) A landlord may consent to a search of premises abandoned by a tenant (*People* v. *Urfer* (1969) 274 Cal.App.2d 307, 310 [79 Cal.Rptr. 60].) Here the owner of the premises, not himself a law enforcement official, determined that his tenants had abandoned the property. This determination was based on the belief that his tenants had themselves unlawfully fired the house and permanently absconded. This conclusion in turn was based on information from private citizens who had observed some of the events at the scene and from firemen who were lawfully in the house to extinguish the blaze.

The situation here is thus unlike that in *Michigan* v. *Tyler, supra,* 436 U.S. 499 [56 L.Ed.2d 486], where it was held that law enforcement officials could not draw a conclusion of abandonment and act thereon based solely upon evidence of arson acquired from their own investigative efforts conducted *on the premises.* (436 U.S. at pp. 505-506 [56 L.Ed.2d at pp. 495-496].)

Here the trial court expressly found an abandonment of the Sutherland Court premises. However, it is not necessary for present purposes that we pass upon the legal sufficiency of the evidence to support that finding, because we are of the view that the circumstances known both to Horner and the officers, whether or not they constituted an abandonment in contemplation of law, justified Sgt. Agler in the reasonable, good faith belief that Horner had authority to consent to search. (*People* v. *Hill* (1968) 69 Cal.2d 550, 554-555 [72 Cal.Rptr. 641, 446 P.2d 521]; *People* v. *Smith, supra,* 63 Cal.2d at p. 799.) Since it is only unreasonable searches that are unlawful, Horner's consent provided discrete justification for the search.

We conclude that the entry and search by Sgt. Agler was lawful (1) under the authority of the search warrant, (2) in reaction to a bona fide life endangering emergency, and (3) pursuant to the consent of the owner.

■ The securing of a search warrant despite the known existence of and reliance upon two alternate grounds for the search, either one of which alone would justify the search, does not detract from the validity of either such alternate ground. (*People* v. *Sirhan, supra,* 7 Cal.3d at p. 739, fn. 17.) In this area the experienced officer knows that a misjudgment can never be retrieved and caution therefore is the better part of discretion.

The fire had destroyed the electrical system in the house. Out of necessity the search was conducted by flashlight and a single light supplied by a portable generator. Only items believed to be of evidentiary value, many of which were in plain sight, were seized (see *Skelton* v. *Superior Court* (1969) 1 Cal.3d 144, 157 [81 Cal.Rptr. 613, 460 P.2d 485]). These included documents pertaining to the identity of the occupants of the house and the membership, structure and activities of the SLA. Entire stacks of papers were removed, necessarily in some cases because their partially burned condition made segregation impractical and might have damaged any fingerprint evidence thereon. Furthermore, the time required to inventory on the premises each individual document seized would have consumed in excess of one week.

We conclude under the circumstances that the search was not unreasonable in scope.

D. Seizure of Keys Removed From Defendants' Persons.

It will be recalled that a set of keys was removed from the persons of both defendants when they were booked by the Concord police. These keys were retained with each defendant's personal property until relinquished later the same day to an officer of the Oakland Police Department who was able to match some of them with the locks of houses and buildings involved in the investigation. The officer did not have a search warrant authorizing seizure of the keys.

The warrantless search of a person at booking and seizure of his property is reasonable. (*United States* v. *Edwards* (1974) 415 U.S. 800, 802-804 [39 L.Ed.2d 771, 774-776, 94 S.Ct. 1234]; *People* v. *Ross* (1967) 67 Cal.2d 64, 70 [60 Cal.Rptr. 254, 429 P.2d 606], revd. on other grounds *sub nom., Ross* v. *California* (1968) 391 U.S. 470 [20 L.Ed.2d 750, 88 S.Ct. 1850].) "Once articles have lawfully fallen into the hands of the police they may examine them to see if they have been stolen, test them to see if they have been used in the commission of a crime, return them to the prisoner on his release, or preserve them for use as evidence at the time of trial. [Citation.] During their period of police custody an arrested person's personal effects, like his person itself, are subject to reasonable inspection, examination, and test." (*People* v. *Rogers* (1966) 241 Cal.App.2d 384, 389-390 [50 Cal.Rptr. 559].)

We are satisfied that the trial court ruled correctly in denying defendants' motions to suppress evidence.

## III. Other Pretrial Motions

A. Motion to Dismiss Indictment.

Defendants cite as error the trial court's denial of their pretrial motions to dismiss the indictment (Pen. Code, § 995.) In the trial court defendants set forth in writing over 90 specific "objections" to grand jury testimony. The same alleged errors are urged upon us.

A number of the prosecutor's questions of grand jury witnesses are condemned as leading or as assuming facts not in evidence. Preliminarily it must be said that many of defendants' objections to the form of the question are simply not well taken. (See generally, Witkin, Cal. Evidence (2d ed. 1966) Introduction of Evidence at Trial, §§ 1155-1162, pp. 1071-1077.) Furthermore, with respect to the second category of question the complaint is in the nature of an objection to the order of proof, since facts so assumed were ultimately proved. More to the point, the defendants' criticism focuses on the form of the question rather than the substance of the answer. As to those objections which have some substance, each such question could have been recast to avoid the objection without calling for, or presumably eliciting, a different response. This category of objection thus does not relate either to the admissibility or competence of the testimony elicited by technically imperfect questions. The testimony in response to such questions deficient in form is not incompetent or inadmissible within the meaning of Penal Code section 939.6, subdivision (b).

Nor in most of the cited instances can the answers of witnesses which are characterized by defendants as opinion and speculation be disregarded as incompetent or inadmissible. Indeed most such complaints of defendants amount to no more than a quibble with the witness' choice of words.

Granting that some questions were defective in form and further granting that some unqualified lay opinion crept into the record, defendants were not prejudiced thereby. The competent, admissible evidence received by the grand jury was sufficient to support the indictment.

A single photograph of Little was shown to several grand jury witnesses who were asked if they could identify him. Citing *Stovall* v. *Denno* (1967) 388 U.S. 293 [18 L.Ed.2d 1199, 87 S.Ct. 1967], Little contends the use of a

single photograph in this manner rendered the resulting identifications impermissibly suggestive. We reject the contention. *Stovall* has no application to an in-court identification during a formal judicial hearing. (See *People* v. *Wheeler* (1971) 23 Cal.App.3d 290 [100 Cal.Rptr. 198].)

Moreover, the record demonstrates that the identifications by the witnesses Damstra and Mullin were based on previous personal contacts with Little and were not dependent on the display of his photograph. With respect to the witness Blackburn, his grand jury testimony identifying Little's photograph was very tentative, indicating only that Little resembled one of two assailants whom he had scarcely noticed as he walked past them in the twilight. Thus Blackburn's identification testimony is of such minimal probative value as to have a negligible effect on the overall weight of the evidence presented to the grand jury.

The indictment is not vulnerable to the criticism that the prosecutor failed to inform the grand jury of a statement, claimed to be exonerating, made by Blackburn while in the hospital and heavily sedated. The statement was to the effect that one or both of his assailants may have been black. (Both defendants are Caucasian.) ▪ The rule of *Johnson* v. *Superior Court* (1975) 15 Cal.3d 248 [124 Cal.Rptr. 32, 539 P.2d 792] requiring disclosure to a grand jury of evidence favorable to the defendant is applicable only to post-*Johnson* indictments. (*People* v. *McAlister* (1976) 54 Cal.App.3d 918, 925-926 [126 Cal.Rptr. 881]; *People* v. *Snow* (1977) 72 Cal.App.3d 950, 957-958 [140 Cal.Rptr. 427].) The instant indictment preceded the *Johnson* decision by over one year.

Furthermore, failure to disclose the Blackburn statement did not violate defendants' rights to due process of law. Given the circumstances under which it was made, the probative value of the statement was extremely tenuous; moreover its substance was not inconsistent with the theory of defendants' guilt as vicariously liable coconspirators.

At trial defendants renewed the motion to dismiss the indictment after Blackburn testified and the prosecutor did not ask him to identify, nor did he identify, either defendant. The trial court properly denied the renewed motion as untimely (Pen. Code, § 997; *People* v. *Waters* (1975) 52 Cal.App.3d 323, 332 [125 Cal.Rptr. 46]). ▪ In any event, in ruling on a motion to dismiss the indictment, the trial court cannot evaluate the credibility of a grand jury witness and the weight of his grand jury testimony by reference to his later testimony at trial no matter the extent

to which the two may appear inconsistent (*People* v. *Manson* (1976) 61 Cal.App.3d 102, 167-168 [132 Cal.Rptr. 265]).

Defendants contend that the standard to be applied by a trial court in ruling on a motion to acquit is the standard that should apply to test the evidentiary sufficiency of an indictment on a motion to dismiss. A motion to acquit should be granted "if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal." (Pen. Code, § 1118.1.) The question raised by defendants should be addressed to the Legislature, not this court.

Upon examination of the transcript, we conclude that there was before the grand jury sufficient competent, admissible evidence to constitute reasonable and probable cause to indict. (Pen. Code, § 995.)

B. Right to Trial in the Vicinage.

Defendants successfully moved venue of the trial from Alameda County. Four counties: Los Angeles, Santa Clara, Monterey and Sacramento, were available in which to try the case. In the trial court, defendants sought transfer to Los Angeles, arguing that it was the only county of those available which approximated Alameda County demographically. Over defendants' objection, the trial was moved to Sacramento County. Defendants contend that when it is necessary to change venue to insure an accused a fair trial, the right to a jury drawn from the vicinage, i.e., the place where the crime occurred, requires that the transferee jurisdiction approximate as closely as possible the racial and ethnic population mix of the county in which the crime was committed.

The right to trial by a jury selected from the residents of the vicinage is guaranteed by the Sixth and Fourteenth Amendments to the federal Constitution (*People* v. *Jones* (1973) 9 Cal.3d 546, 556 [108 Cal.Rptr. 345, 510 P.2d 705]). Since by definition the right may be exercised only in a fixed location, it does not follow an accused when he is tried outside the jurisdiction where the crime occurred. The right to trial by a jury selected from the vicinage may be waived; it has been held to have been waived by a successful motion to change venue. (*United States* v. *Angiulo* (1st Cir. 1974) 497 F.2d 440, 441, cert. den., 419 U.S. 896 [42 L.Ed.2d 140, 95 S.Ct. 175].) Under the circumstances here then, defendants' "vicinage" right did not oblige the trial court to transfer the trial to the available county most demographically congruent with Alameda County.

In any event, defendants fell far short of demonstrating significant demographic differences between Sacramento and Los Angeles Counties. They produced 1970 census figures which showed a nonwhite population in Alameda County of 21 percent, in Los Angeles County of 14 percent, and in Sacramento County of 10 percent. The 4 percent differential between Los Angeles and Sacramento Counties is not constitutionally significant. Moreover, the proof shows, as defendants concede, that Los Angeles County, defendants' preferred place of trial, was significantly less heterogenous than Alameda County.

C. Motion to Quash Jury Panel.

Defendants assert that their constitutional right to be tried by a jury drawn from a representative cross-section of the community was infringed because the exclusive use of voter registration lists to compile the venire from which their jury was selected resulted in underrepresentation on the venire of black, Spanish-speaking and surnamed and poor people. The latter are deemed by defendants to include those with annual incomes of less than $6,000. Defendants preserved the issue for appeal by a timely motion before trial to quash the jury panel. The motion was denied.

"The use of voter registration lists as the sole source of jurors is not constitutionally invalid [citations], at least in the absence of a showing that the use of those lists resulted 'in the systematic exclusion of a "cognizable group or class of qualified citizens" ' [citations], or that there was 'discrimination in the compiling of such voter registration lists.' [Citations.]" (Fn. omitted; *People* v. *Sirhan, supra,* 7 Cal.3d at pp. 749-750.)

Prospective jurors are obtained in Sacramento County by random selection from among all the registered voters. Defendants do not claim discrimination in the compiling of those lists.

It is defendants' burden to establish prima facie the systematic exclusion or underrepresentation of cognizable groups in the community and that a group alleged to be excluded or underrepresented is in fact cognizable, i.e., characterized by a "similarity of attitudes, ideas or experience among its members so that the exclusion prevents juries from reflecting a cross-section of the community." (*Adams* v. *Superior Court* (1974) 12 Cal.3d 55, 60 [115 Cal.Rptr. 247, 524 P.2d 375].)

Defendants failed to carry their burden. It was shown that in some areas of Sacramento County with proportionately higher concentrations of black, Spanish-speaking and surnamed, and poor people, a lower percentage of all those age 18 or over residing therein were registered to vote than in the areas of the county with less intense minority concentrations. However, it was not shown how many black, Spanish-speaking and surnamed, or poor people age 18 or over resided in those areas of higher minority concentration. Thus defendants' proof did not exclude the possibility that an even higher percentage of minorities in the areas surveyed were registered to vote than the percentage of residents age 18 or over registered in nonminority areas of the county. Furthermore, defendants' thesis of underrepresentation is based on a comparison of 1970 population figures with 1975 voter registration statistics, an anomoly which led one of defendants' own experts to opine that conclusions from such a comparison may be totally invalid because population statistics vary substantially within a five-year period.

In summary, defendants failed to show that black, Spanish-speaking and surnamed or poor people were registered to vote at a lower percentage rate than the remaining voters in the county; consequently, defendants have not proved underrepresentation of those minorities on the jury venire.

Defendants argue, however, that all those who reside in the areas with high minority concentrations, all of which are located in the core city or within the urban area of Sacramento County, constitute a cognizable class; defendants claim to have proved underrepresentation of this "class" by virtue of the fact that a lower percentage of such residents age 18 or over register to vote than in other areas of the county. We do not agree that a cognizable class can be established merely on the basis of common geographical location (*People* v. *McDowell* (1972) 27 Cal.App.3d 864, 875 [104 Cal.Rptr. 181]). The only shared characteristic of this "class" is that, for whatever reason, the members do not choose to register to vote with the same incidence as residents of other areas of the county. That trait, however, does not identify a cognizable class which must be included in a jury venire if it is to be representative. (*People* v. *Sirhan, supra,* 7 Cal.3d at p. 750, fn. 26.)

The trial court properly denied the defendants' motion to quash the jury panel.

IV. ALLEGED ERRORS DURING TRIAL

A. Misconduct of Prosecutor in Opening Statement.

In his opening statement the prosecutor presaged proof that the engine in the Chevrolet van was obtained in an uncharged robbery committed by Remiro in Berkeley in October 1973 in which a white van was stolen. Defendants' objection thereto was overruled and a later motion for mistrial was denied. Still later in the trial, out of the presence of the jury, the prosecutor offered evidence of the robbery and disposition of the loot as proof of an overt act relevant to the conspiracy theory upon which the case was tried. The trial court sustained defendants' objection to the admission of the evidence. Neither then nor thereafter did defendants' move to strike the offending part of the opening statement or request a curative admonition.

Without identifying the legal bases therefor, defendants complain they were prejudiced by the prosecutor's opening statement. We observe, however, that the record will not support a finding of bad faith or resort to deceptive or reprehensible tactics on the part of the prosecutor. (See *People* v. *Beivelman* (1968) 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913].) In the context of this protracted trial, the remarks singled out for condemnation fade into insignificance in comparison with the quantum of competent evidence of defendants' guilt. Thus failure to request a curative admonition constitutes a waiver of any claim of error on appeal. (*People* v. *Beivelman, supra.*)

B. Evidence of SLA Terrorist Conspiracy.

Defendants assert error in permitting the People over objection to introduce evidence of the broader scope of the SLA conspiracy of which the Foster-Blackburn murder-assault were but a single manifestation. In particular they complain of the introduction of several SLA communiques seized in the Concord house which reveal plans to attack officials of the Department of Corrections and their families, the General Tire and Rubber Company plant in Burlingame and the Avis Rent-A-Car Company, and to kidnap a member of the University of California Board of Regents and an executive of Kaiser Industries in Oakland. Also introduced over defense objections were items of evidence tending to show preparations for carrying out the activities described in the communiques, including hand-drawn maps of relevant locations, personal data regarding projected kidnap victims and notes suggestive of preparatory surveil-

lance activities. Defendants insist that evidence going beyond the narrow scope of the plans for and perpetration of the Foster murder is irrelevant and more prejudicial than probative.

Although conspiracy was not charged, the case was tried on a conspiracy theory. Failure to charge conspiracy as a separate offense does not preclude the People from proving that those substantive offenses which are charged were committed in furtherance of a criminal conspiracy. (*People* v. *Pike* (1962) 58 Cal.2d 70, 88 [22 Cal.Rptr. 664, 372 P.2d 656]); nor, it follows, does it preclude the giving of jury instructions based on a conspiracy theory (*People* v. *Washington* (1969) 71 Cal.2d 1170, 1174 [81 Cal.Rptr. 5, 459 P.2d 259, 39 A.L.R.3d 541]; *People* v. *Ditson* (1962) 57 Cal.2d 415, 447 [20 Cal.Rptr. 165, 369 P.2d 714]).

Furthermore, contrary to defendants' claim, neither law, logic nor common experience dictates that a criminal conspiracy may embrace only one criminal act. The scope of a given conspiracy may be as limited or as expansive as the capacity of criminal minds to design unlawful combinations. In *People* v. *Manson, supra,* 61 Cal.App.3d 102, defendants were engaged in a conspiracy of dimensions far broader than the murders with which they were charged. The objective of the conspiracy was the realization of Manson's fanatical dream of a racial war, a cataclysm he referred to as "Helter Skelter." In upholding the admission under the coconspirator exception to the hearsay rule of a statement by Manson to a coconspirator after the charged killings had been committed, the Court of Appeal stated, "Boundaries of a conspiracy are not limited by the substantive crimes committed in furtherance of the agreement. [Par.] Here the conspiracy amounted to fulfillment of Manson's prophesy. . . . The gist of the conspiracy was the comprehended common design, however bizarre and fanciful. It is not necessary that the object of the conspiracy be carried out or completed. [Citations.] The corollary of that proposition is that the conspiracy continues until it is accomplished or abandoned. It is obvious that Helter Skelter was never realized and the conspiracy remained pending. . . ." (Fn. omitted; *People* v. *Manson, supra,* 61 Cal.App.3d at pp. 155-156.)

Similarly, in the case at bench, the slaying of Superintendent Foster was only a step in a planned series of terrorist activities designed to accomplish the SLA's avowed goal of fomenting a violent upheaval within American society in order to effect revolutionary change. Here, as in *Manson,* the ultimate goals of the conspirators were never achieved. A SLA communique of February 4, 1974, claiming credit for the Patricia

Hearst kidnapping, and the gun battle with Los Angeles police on May 17, 1974, in which six SLA members died both tended to prove that the conspiracy of which these defendants were members continued in existence at least until the date of the Los Angeles gun battle.

The challenged evidence was relevant and admissible to show the nature and scope of the conspiracy which spawned the plans to murder Foster and Blackburn. Evidence of conspiratorial activities both before and after the commission of the charged offenses was necessary to show the commitment of defendants and their coconspirators to the common design and their active participation in the means intended to further its implementation, all of which was relevant to and highly probative of defendants' criminal culpability in the charged offenses which were themselves but one of several means calculated to achieve the common goal. (*People* v. *Manson, supra,* 61 Cal.App.3d at pp. 155-156; *People* v. *Cowan* (1940) 38 Cal.App.2d 231, 239 [101 P.2d 125]; *People* v. *Wilson* (1926) 76 Cal.App. 688, 694 [245 P. 781]; *People* v. *Schmidt* (1917) 33 Cal.App. 426, 446 [165 P. 555].)

There is no merit in defendants' claim that the probative value of the conspiracy evidence was outweighed by its prejudicial effect. (Evid. Code, § 352.) The record demonstrates that the trial court considered at length defendants' objections on this basis at trial, and chose in its discretion to admit the evidence. ▮ The trial court decision admitting evidence over the objection that it is more prejudicial than probative will not be disturbed on appeal absent a showing of manifest abuse of discretion resulting in a miscarriage of justice. (*People* v. *Wein* (1977) 69 Cal.App.3d 79, 90 [137 Cal.Rptr. 814].) No such showing has been made here.

Defendants claim there was insufficient evidence adduced to prove their participation in the SLA conspiracy. ▮ It is well-settled that the unlawful agreement among conspirators may be inferred from the conduct of defendants in mutually carrying out a common illegal purpose, the nature of the act done, the relationship of the parties, the interests of the alleged conspirators and other circumstances (*People* v. *Cockrell* (1965) 63 Cal.2d 659, 667 [47 Cal.Rptr. 788, 408 P.2d 116]; *People* v. *Johnson* (1969) 276 Cal.App.2d 232, 237-238 [80 Cal.Rptr. 683]; *People* v. *Lynam* (1968) 261 Cal.App.2d 490, 502 [68 Cal.Rptr. 202]). Here, the very nature of the Foster murder—a planned, coordinated ambush carried out by three persons acting together—points ineluctably to a conspiracy. Remiro's ownership and possession of one of the Foster murder weapons and Little's ownership of another weapon possibly used

in the killing, defendants' relationships to the Sutherland Court house and its contents, their associations with Nancy Ling Perry, Donald DeFreeze, Willie Wolfe, Camilla Hall, Angela Atwood and Patricia Soltysik, their adherence to and performance of acts in furtherance of the principles set forth in the SLA manifesto, and their consciousness of guilt as evidenced by the flight from and shoot-out with Sgt. Duge and their attempted escape from jail (discussed *infra*) all furnished more than an adequate evidentiary basis tying them to the conspiracy.[4]

A stronger than prima facie showing of the existence of a conspiracy had been made before evidence of acts and declarations in furtherance thereof was admitted. (Cf. Evid. Code, § 1223; *People* v. *Lawrence* (1972) 25 Cal.App.3d 498, 510-511 [102 Cal.Rptr. 16].) The order of proof thereafter was a matter for the discretion of the trial judge. The record reveals no abuse.

[4]Remiro purchased the .380 Walther pistol used to kill Foster in July 1973 at a San Leandro sporting goods store.

Little purchased the .38 caliber Rossi revolver in March 1973 from a private party. The bill of sale was made out to a fictitious purchaser.

Among the items of evidence seized in the Concord house was a document entitled "The Seven Principles of the Symbionese Liberation Army" (sometimes referred to herein as the "SLA manifesto"). It spelled out the credo and goals of the SLA and the means of implementing them. Little's fingerprints were found on several pages thereof. Little's fingerprints were also found on two unnumbered SLA communiques—one concerning a plan to kidnap a named Kaiser Corporation executive for ransom and another concerning an attack on the General Tire and Rubber Company in Burlingame, on a list of Regents and officers of the University of California, on a piece of paper containing a name and address identified thereon as that of the "Treas. of Bd. of Regents," on a list of gun stores and a book entitled *Markmanship* and on many other documents admitted into evidence which were seized in the Concord house. Remiro's fingerprints were also found on the *Markmanship* book, and on a notebook containing handwritten notes which recited some of the seven principles of the Symbionese Liberation Army and which also contained a hand-drawn sketch of the area around the administrative offices of the Oakland Unified School District where Superintendent Foster was shot. Remiro's fingerprints were found on several other pieces of documentary evidence seized in the Concord house. Fingerprints of Perry, Soltysik and DeFreeze were also found on numerous documents seized at that location.

There was a plethora of evidence showing close association among defendants and the six-named SLA members over a substantial period of time. This included evidence that Little had assisted DeFreeze to evade apprehension after his escape from Soledad Prison in March 1973 and evidence that various combinations of these individuals visited an East Bay firing range on several occasions in 1973 and practice-fired weapons. William and Emily Harris also participated in some of the latter activities.

As examples of fealty to SLA goals, defendants acquired false identification papers and were involved in the rental of apartments and houses intended to serve as safe houses for SLA "combat units;" they also acquired numerous weapons and ammunition for stockpiling all in accordance with the approved modus operandi set forth in the SLA manifesto.

## C. Evidence of Escape Attempt.

On March 1, 1975, approximately one month before trial began, defendants attempted forcibly to escape from the Alameda County jail. Before they were subdued, Remiro had knocked a guard to the floor, gouged him in the eye, taken his keys and inserted them in the lock on a gun locker; Little had knocked another guard to the floor, stabbed him in the throat with a pencil and battered him repeatedly as the guard struggled to reach an alarm to summon help.

At trial defendants sought to exclude all testimony regarding their escape attempt, arguing the prejudicial effect of such evidence outweighs its probative value on the issue of consciousness of guilt. Defendants contend that since they were then being held in custody for other charges in addition to the Foster-Blackburn murder-assault (the other charges arose out of the shoot-out with Sgt. Duge in Contra Costa County), and since the escape attempt occurred almost 16 months after the Foster murder, an inference therefrom of consciousness of guilt could as well be ascribed to the Contra Costa County charges then pending as to the Foster-Blackburn case. Defendants also urge the evidence is unduly inflammatory due to the assaultive nature of the escape attempt.

Evidence of escape from custody pending trial is admissible on the issue of consciousness of guilt (*People* v. *Terry* (1970) 2 Cal.3d 362, 395 [85 Cal.Rptr. 409, 466 P.2d 961]; *People* v. *Burnett* (1967) 251 Cal.App.2d 651, 654-655 [59 Cal.Rptr. 652]). Remoteness of the escape attempt from the crime as to which it is offered to prove consciousness of guilt goes to weight, not admissibility (*People* v. *Terry, supra,* 2 Cal.3d at p. 395); pendency of charges in addition to that as to which the escape attempt is offered to show consciousness of guilt likewise goes to the weight rather than the admissibility of the evidence (*People* v. *Perry* (1972) 7 Cal.3d 756, 772-774 [103 Cal.Rptr. 161, 499 P.2d 129]).

Evidence of defendants' assault on their jailers was essential to prove the escape attempt and to permit the jury to assess the effect and value of the evidence on the issue of consciousness of guilt.

The evidence of attempted escape was properly admitted.

## D. Other Evidence Claimed to Be Irrelevant and Prejudicial.

Gary Ling, Nancy Ling Perry's brother, testified and identified his sister's handwriting in a notebook which was seized at 1560 Sutherland

Court. The notebook contained a hand-drawn map of the Foster ambush site. Ling was a competent witness to identify his sister's handwriting (Evid. Code, § 1416; *People v. Williams* (1960) 187 Cal.App.2d 355, 367 [9 Cal.Rptr. 722]). His testimony was relevant in establishing a foundation for the notebook's admissibility. The notebook itself was relevant to proof of the general SLA conspiracy and the specific plan to assassinate Foster and Blackburn.

Colton Westbrook testified about the Black Cultural Association, an outside group concerned with the rights of black prisoners at the California Medical Facility at Vacaville. Westbrook testified that Little, Willie Wolfe and others attended association meetings in Vacaville in the spring and summer of 1972; Donald DeFreeze, then a prison inmate at Vacaville, was an active participant in the association during the time of Little's attendance. The trial court limited the jury's consideration of Westbrook's testimony to the case against Little. The testimony was relevant in showing an early association among Wolfe, Little, and DeFreeze who became coconspirators within a few months thereafter.

■ Wilbur Taylor, president of the Chabot Gun Club in Oakland, laid an evidentiary foundation for sign-in sheets at the club shooting range for several dates from April 6, 1973, through November 4, 1973. Appearing on these sheets in various combinations on identical days were the names of defendants and Willie Wolfe, M. Soltysik, N. Perry, Angela Atwood, William Harris and Emily Harris. Taylor was not personally present when any of these sheets were signed.

The records were admissible under Evidence Code section 1271 which authorizes the receipt under the business records exception to the hearsay rule of a writing made in the regular course of business at or near the time of the act, condition or event recorded, when the custodian of records or other qualified witness testifies to the document's identity and its mode of preparation and when, in the opinion of the court, the sources of information, method, and time of preparation are such as to justify its admission. Admissibility of such records is within the broad discretion of the trial court (*People v. Williams* (1973) 36 Cal.App.3d 262, 275 [111 Cal.Rptr. 378]). The fact that the person who actually prepared the record is not called as a witness does not render the document inadmissible (*People v. Williams, supra,* 36 Cal.App.3d at p. 275). Taylor's testimony provided an adequate foundation for admission of the sign-in sheets.

The fact that the sign-in sheets do not show that any of the conspirators were necessarily present at the same time goes only to the weight, not the admissibility, of the evidence. The evidence itself tends to show association of the conspirators and preparations to achieve the objects of the conspiracy and thus is relevant.

Christopher Thompson testified that he sold the .38 caliber Rossi revolver to Little in March 1973. A firearms expert identified the Rossi as a possible murder weapon and as the weapon which fired some of the shells found at 1560 Sutherland Court. Regardless of whether he ever personally used the weapon, Little's purchase of it was evidence of conduct in furtherance of the SLA's goals. The testimony was thus relevant.

Witnesses Agler and Tamborski made brief reference to the presence of pipe bombs in the Sutherland Court house; witness Robert Manning referred to the arrival of the bomb squad. The relevance of the evidence is clear in conjunction with other evidence tending to associate defendants with the Concord house as it suggests that defendants' involvement with the SLA was more than a mere devotion to the group's fanatical rhetoric and in fact extended to participation in amassing arms as called for by the organization's written credo.

### V. SECURITY MEASURES AT TRIAL

Defendants charge their right to public trial was infringed by the implementation of a sheriff's security order which for a time apparently permitted the photographing, fingerprinting and searching of members of the public seeking entry to the trial (the order is not part of the record on appeal). The order was modified by the court on the 11th day of defendants' 46-day trial to delete the fingerprinting requirement.[5]

Defendants assert the order discouraged some members of the public from attending the trial and thus the trial was not public. "Under normal conditions a public trial is one which is open to the general public at all times. This right of attendance may be curtailed under special circumstances without infringement of the constitutional right, but it cannot be denied altogether, nor can it be restricted except in cases of

---

[5]On April 17, 1975 (the 12th day of trial), a petition for extraordinary relief was filed in this court by the American Civil Liberties Union seeking on behalf of certain alleged would-be spectators to prohibit further implementation of the security order. We denied the petition on April 24, 1975 (*Jordan, et al.* v. *Lowe*, 3 Civ. 15181).

necessity. The most common of these is the necessity of preserving order and preventing interference with the proceedings." (*People* v. *Byrnes* (1948) 84 Cal.App.2d 72, 73 [190 P.2d 290].)

■ In one of the exchanges between court and counsel in this matter, the court indicated it felt the security measures other than fingerprinting remained appropriate due to a threat to bomb the Sacramento County courthouse received by the sheriff after defendants' arrival in Sacramento for trial, and the background of the SLA and defendants' alleged involvement with that group. It is also apparent from the record that the trial court felt the security measures were necessary in part for defendants' own protection as it had been reported that certain persons in disagreement with their political philosophies might attempt to gain entrance to the trial.

Furthermore, from the record in *Jordan* v. *Lowe* (see fn. 5, *ante,* p. 847), we note the court could well fear that defendants posed a security risk not only in terms of the possibility that some of their comrades still at large might attempt some sort of rescue maneuver, but also because jeweler's saws were found in defendants' effects when they were transferred from Alameda to Sacramento County. Also leaflets were being distributed at the courthouse urging protests and demonstrations to free "prisoners of war" Little and Remiro. And known members of the Weather Underground, a group which had claimed responsibility for bombings and other acts of violence, attended defendants' trial. In fact, during cross-examination of prosecution witness Christopher Thompson, Little physically attacked him on the witness stand to the verbal encouragement of a trial spectator shouting, "Kill him! Kill him!"

In this atmosphere the security order was eminently reasonable as an aid in law enforcement's endeavor to guard against possible harm to defendants, the officers of the court, and trial spectators themselves. Even so, despite these measures, there was no wholesale exclusion of the public from the trial. Defendants' rights to a public trial were not improperly curtailed.

## VI. DISPOSITION

The judgment of conviction as to defendant Remiro is affirmed. Because the giving of the instruction condemned in *People* v. *Gainer, supra,* constituted prejudicial error per se, the judgment of conviction as to defendant Little must be and is reversed.

Paras, J., concurred.

**KARLTON, J.**\*—I concur in the majority's determination that under compulsion of *People* v. *Gainer* (1977) 19 Cal.3d 835 [139 Cal.Rptr. 861, 566 P.2d 997], the conviction of defendant Little must be reversed. I must respectfully dissent from the majority's failure to reverse the Remiro conviction on the same basis.[1]

Under present law a retrial free of the error condemned in *People* v. *Gainer, supra,* is required in both the Little and Remiro cases. The issue presented to this intermediate tribunal is neither the guilt nor innocence of the defendants (that is a matter for the jury), nor whether *"Gainer"* error should be per se reversible (that having been determined by the Supreme Court). Our function in this case is to apply the law explicated by the Supreme Court to proceedings in the trial court; when we do so, reversal is required.

In *People* v. *Gainer, supra,* the Supreme Court held, in terms leaving no room for interpretation, "in criminal trials an *Allen* instruction 'should never again be read in a California courtroom'. " (*People* v. *Gainer, supra,* at p. 857.) An *Allen*-type instruction was read in this case. In *Gainer,* the Supreme Court determined its ruling would be applicable "to all cases not yet final as of the date of this decision." (*Id.,* at p. 853.) This case was not yet final as of the date of this decision. In *Gainer,* the court held that the portion of the *Allen* instruction admonishing minority jurors to reexamine their position is per se reversible error (*id.,* at pp. 854-855). Such an admonition was given in this case. The three elements being present, the result seems inevitable.

The majority argues that it does not violate the "per se" rule of *Gainer* "because it is evident that the jury had already concluded its deliberations with respect to Remiro before the giving of the erroneous instruction on June 9." It must first be observed that the nature of a per se rule is that it is per se. This court is precluded from making the very determination which the majority undertakes. Moreover, because of the extremely limited circumstances under which a jury's deliberations may

---

\*Assigned by the Chairperson of the Judicial Council.

[1]Because I believe the conviction of both defendants must be reversed, and because the majority has decided otherwise, I will not discuss the various other issues raised by the defendants. Given the majority's ruling, such a discussion would merely extend this opinion beyond tolerable limits for no perceptible purpose. I simply note that I do not concur in all of the court's other rulings.

be made of record (see, e.g., *Silverhart* v. *Mount Zion Hospital* (1971) 20 Cal.App.3d 1022 [98 Cal.Rptr. 187, 54 A.L.R.3d 250]) at best the majority may only infer that the *Allen* instruction had no effect. Indeed, an examination of the majority opinion demonstrates that very fact. For instance the majority observes, "The identity of that defendant was established *circumstantially* when the verdicts were returned in open court. . . . That these dates were not inaccurate can be *inferred* from the court's instruction . . . ." (Italics added.)

Moreover, I cannot concur in the majority's denial that the giving of the *Allen* instruction affected the jury's reconsidering its verdict. The majority argues that "that possibility, theoretical only, finds no support in the record." This is a per se rule, and the appellant has no burden whatsoever to demonstrate support in the record. Moreover, the giving of the *Allen* instruction, in itself, might well preclude jurors with doubt from raising the doubt subsequent to the signing of the verdict but before that verdict was recorded and thus became final. Again, any such doubts cannot be the subject of an admissible affidavit and thus cannot be part of the record. (*Silverhart* v. *Mount Zion Hospital, supra,* 20 Cal.App.3d 1022.) The court's determination "that the erroneous instruction could have had no effect" is simply untenable. We certainly may reasonably assume that it did not affect the jury's determination, and undoubtedly the record would support such an assumption, but such determinations or assumptions are simply not open to us under *Gainer.*

The majority makes a very persuasive case that, at least insofar as defendant Remiro, the law ought not to be per se reversal, since the *Allen* instruction did not affect the verdict. The majority is free to use the peculiar facts in this case to demonstrate what the law ought to be; however, with the greatest of respect, I suggest the majority is not free to substitute a prejudicial error doctrine for a per se rule (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937]). To use Mr. Witkin's felicitous phrase, "we are bound but not gagged." (Witkin, Manual on Appellate Court Opinions (1977) pp. 168-169.)

Aside from stare decisis, the majority opinion fails to address a critical basis for the per se rule—judicial economy. The Supreme Court recognized that the partial retroactivity of *Gainer* would have a significant

impact on the courts. It chose that the impact would fall on trial rather than appellate courts.[2]

The Supreme Court, in explaining its ruling, noted "This conclusion also has the beneficial effect of removing a fertile source of criminal appeals. Were the giving of an *Allen*-type charge potentially proper, the appellate courts of this state would be required to sift the facts and circumstances of each case in which the charge was delivered to determine whether the charge placed undue pressure on the jury to agree. . . . Other courts which have banned *Allen* have also done so in the name of appellate economy. [Citations.]" (*People* v. *Gainer, supra,* 19 Cal.3d at pp. 852-853, fn. 17.)

As I have indicated, the majority makes a good case that exception to the per se rule is appropriate—but as to the question of reversal, that argument is irrelevant. What Justice Jackson said concerning the United States Supreme Court is equally true of our Supreme Court: "[They] are not final because [they] are infallible, but [they] are infallible only because [they] are final." (*Brown* v. *Allen* (1953) 344 U.S. 443, 540 [97 L.Ed. 469, 533, 73 S.Ct. 397] (conc. opn. of Jackson, J.).)

Inasmuch as I concur in the judgment concerning the reversal of the Little conviction, extended discussion of that portion of the opinion is not required.

The Supreme Court briefly discussed the issue of retroactivity in its decision and, noting that the purpose of the *Gainer* decision was to rectify "judicial error which significantly infects the fact-finding process at trial," determined that the rule there announced would "apply to the instant matter and to all cases not yet final as of the date of this decision." (*People* v. *Gainer, supra,* 19 Cal.3d at p. 853.) The issue of retroactivity is one of extreme complexity, and reasonable people might well disagree as to the application of the criteria to a given situation.

I am less certain than my brethren of the majority that the "tarnished reputation" of the judiciary is related to our high court's efforts to ensure criminal trials consistent with values inherent in our Constitution and

---

[2]As a trial judge, under the famous determinative doctrine of "whose 'ox is being gored,' " I might have preferred a different choice—but like my brethren, no one asked us.

fundamental notions of a fair trial. However that may be, our sworn duty is to protect those principles and I cannot help but believe that the abandonment of such principles would ultimately only lead to the people's justified contempt for the courts. We need not fear, however. I have confidence in both our courts and our people. I suspect that someday in the future, the majority's hyperbole will be viewed with bemused wonder.

A petition for a rehearing was denied March 23, 1979, and the petitions of appellant Remiro and respondent for a hearing by the Supreme Court were denied May 3, 1979. Clark, J., and Richardson, J., were of the opinion that the petitions should be granted.